## STEWART–WARNER CORPORATION v. LE VALLY et al. *
### No. 13955.

District Court, N. D. Illinois, E. D.
July 15, 1936.

Williams, Bradbury, McCaleb & Hinkle, of Chicago, Ill., for plaintiff.

Wilkinson, Huxley, Byron & Knight, of Chicago, Ill., and Delos G. Haynes and Lloyd R. Koenig, both of St. Louis, Mo., for defendants.

LINDLEY, District Judge.

Plaintiff, as assignee and owner of patent No. 1,593,791 to Butler, applied for February 19, 1923, and allowed July 27, 1926, sues the Lincoln Engineering Company of Illinois for contributory infringement of claim 2. The defenses are invalidity and noninfringement.

Claim 2 [1] of the Butler patent describes a lubricating system for automobiles or other machines, essentially high pressure in character, in which each bearing is provided with a headed nipple for receiving oil or grease of a lubricant compressor having a coupling member for connecting said compressor with the nipples. The coupler is slipped easily and somewhat loosely over the nipple head. As the operator pushes on the compressor, the pressure of the lubricant moves a piston within the cylinder in such a manner as to cause the locking or gripping jaws to clutch or grab about or upon the nipple head. At the same time the grease under pressure acts also upon an apertured sealing seat, carried by the jaws and actuated by the piston in such a way as to engage the end of the nipple and thereby produce a tight seal. Gripping, grabbing, or clutching of

[1] Claim 2. The combination with a headed nipple for receiving lubricant, of a lubricant compressor having a coupling member for connecting said compressor and nipple comprising a cylinder, a piston movable within the cylinder, and having an aperture for the discharge of lubricant thereof, an apertured sealing seat carried by said piston for engagement with the end of the nipple, connecting the piston aperture with a passage through the nipple radially movable locking elements carried by the cylinder coacting with the nipple and actuated by said piston for compressively clutching the elements upon the nipple whereby the pressure of the lubricant on said piston will move the piston to forcibly compress said elements while the lubricant is passing through said connecting parts.

*For opinion on rehearing, see —— F. Supp. ——.

the nipple is effected automatically, and engagement of the seal against the end of the nipple is achieved in the same manner. Both of these functions are effectuated by the pressure of the lubricant, without other manipulation of the coupler. Thus, the coupler and nipple are so constructed as to produce an essential relationship between the two functions and the mechanism for performing them. Yet each of the two functions is carried out completely and perfectly without interference by the other. As a result, the operation is successful even though there be considerable variation in the precise dimensions in the forms and parts involved.

Upon analysis we find that the claim includes seven elements; namely, a headed nipple, a compressor or pump, a cylinder, a piston, an opening in the piston, a sealing seat, and laterally or radially moving locking elements or jaws. Admittedly, each of these elements is old, and plaintiff makes no claim of invention because of the presence of any one of the particular elements, but insists that invention resides in a new combination of old elements so associated, related and interrelated as to accomplish a new result.

The headed nipples are adapted to be screwed to each of the bearings of an automobile; the compressors are intended to be filled with grease and then to be coupled in succession to each of the nipples in order to inject grease into the openings of the several bearings. Consequently, the combination of the nipple, compressor, and coupler is brought together only periodically and temporarily and in the hands of the owners or servicers of the car. The manufacturer of the car buys the headed nipples and inserts them in the bearings. An automobile may require 25 to 60 such fittings. Some bearings can be conveniently greased with a straight nipple; others with an elbow nipple, at angles varying from 90° to 22½°. Some of the nipples are long, others short, and they are screwed into holes tapped with different pipe thread sizes. Consequently, the manufacturer of the device separately lists and prices each of the sizes of compressor which may be coupled to and used in conjunction with the nipples. Thus the purchaser may buy such nipples as he desires and a compressor of small capacity or one of large capacity, or even a power-driven compressor. An automobile owner may never use a compressor. He may have his car greased at a garage,

and in such case the combination occurs only when the car is greased.

In this respect the combination differs from that usually found in industry. Ordinarily, a manufacturer makes and sells the complete combination, but in the business of high-pressure lubricating equipment, the parts are necessarily sold separately. So, prior to the commencement of this suit, some 6,000,000 Alemite hydraulic guns or compressors claimed to have been embodied within the Butler patent were sold by plaintiff, and during the same period it distributed some 218,000,000 of its so-called Alemite hydraulic system nipples.

For seven years prior to January, 1933, the Lincoln Engineering Company of St. Louis, Mo., who is defending this suit, and who is treated herein as the real defendant, had manufactured grease guns for plaintiff. The latter took all of its product. Stewart-Warner had furnished couplers and nozzles to Lincoln, and the latter had incorporated them in compressors, which it in turn sold to Stewart-Warner. These compressors and nozzles were used in combination with hundreds of millions of Gullborg pin fittings and Zerk push type fittings manufactured and sold by plaintiff.

Early in 1933, the Lincoln Company decided to undertake the direct sale of its compressors to service stations and garages and took steps to create a distributing organization for such purpose. Prior to that time, for many years, practically all American-made automobiles had been equipped at their factories with pin fittings sold and manufactured by plaintiff under Gullborg or with push type fittings, manufactured and sold by plaintiff under Zerk. Hundreds of millions of these nipples were in the field, practically to the exclusion of anything else adapted to lubrication of automobile bearings. Consequently, the Lincoln Company, in order to sell its compressors, found it necessary to incorporate a terminal of such character as would connect with and co-operate satisfactorily with these Gullborg and Zerk nipples. As a result it brought out its N–1 needle type nozzles.

In April, 1933, plaintiff through its subsidiary the Alemite Corporation, put upon the market its new Alemite hydraulic system involving the combination now relied upon. Soon thereafter the Lincoln Company, in its advertising, claimed that its compressors could be used not only with Gullborg fittings and Zerk push type

nozzles, but also with the headed nipple of the Alemite Corporation which plaintiff claims is protected by the Butler combination patent.

In July, 1934, Lincoln's advertising literature illustrated all three types of fittings as the various kinds of nipples with which the Lincoln compressor and nozzle were intended to be combined and used. Thus far, however, the Lincoln Company had not manufactured or sold any nipples of any kind for use in the lubrication of automobiles. But in the summer or early fall of 1934, after the Alemite system had been on the market for one and a half years, Lincoln entered upon negotiations with General Motors Corporation to sell to it in lieu of Alemite hydraulic fittings, theretofore manufactured and sold to it by plaintiff, a new fitting to be manufactured for the first time by Lincoln. The negotiators had under discussion round-headed and straight-sided nipples, without head, shoulder, or peripheral groove, not adapted for co-operation with the gripping jaws of the Alemite hydraulic coupler, but properly adapted for use in conjunction with the Lincoln N–1 nozzle and Lincoln Snap-On coupler.

No straight-sided nipples, other than a few samples, were manufactured or sold. On the other hand, Lincoln began to manu- facture a peripherally grooved, shouldered, and headed nipple of form, size, and dimensions as to afford perfect co-operation with the gripping jaws of the Alemite hydraulic coupler. The first of these nipples were shipped to the Oldsmobile factory on November 24, 1934, and displaced the purchase and use of the Alemite fitting. Shortly thereafter, Cadillac, Buick, and Pontiac switched from the peripherally grooved and headed nipples of plaintiff to those of Lincoln. These branches of General Motors, however, except as to cars sold in foreign countries, included no purchase of couplers.

For eighteen months plaintiff had attempted to put its new coupler into the hands of every garage and service station in the United States. On April 1, 1935, 2,385,148 such couplers had been sold. It appears clearly that the sale of Lincoln Kleenseal fittings dates from the shipment made to Oldsmobile and that the fitting satisfactorily serves with plaintiff's compressor. Thus, the purchasers of automobiles from General Motors divisions could have their cars, equipped with Kleenseal

fittings, greased with the Alemite hydraulic compressors and couplers then in the hands of the service stations and garages through the country.

Mr. Fox, an engineer for Lincoln, became familiar with plaintiff's headed nipple shortly after its first appearance on the market in April, 1933. The automobile trade papers were, in that spring, summer, and fall, replete with advertisements and reading notices illustrating and describing every detail of plaintiff's hydraulic coupler, and Lincoln in July, 1934, illustrated in its circulars, Alemite headed nipples as being capable of combination with the Lincoln compressor. It is only a fair inference that during all of this period Lincoln, which seems to have been alert in its business, knew about and understood the Alemite compressor. At any rate, Mr. Fox admits that he became familiar with the coupler in January, 1935, and from that time on, Lincoln sold its peripherally grooved, shouldered, and headed nipples, adapted for satisfactory co-operation with the Alemite hydraulic compressor, with the knowledge that the purchasers of the Lincoln nipples could use them and would use them in conjunction and combination with the Alemite compressors and couplers. Furthermore, that company became familiar with the Alemite fittings immediately upon their appearance in April, 1933, and when the Lincoln nipples were first put on the market in November, 1934, they were in some thirty odd styles having arbitrary dimensions corresponding with those of the Alemite headed nipples and having their structure of such size, form, and dimensions as to make them completely interchangeable with Alemite nipples.

On April 17, 1935, a representative of plaintiff went to the place of business of Lincoln in Chicago and said to the man behind the counter that he wanted to purchase some nipples to be used with a gun which he then produced, an Alemite hydraulic compressor and coupler. The man produced Lincoln fittings. The witness tried them in co-operation with the gun and found that they co-operated with the Alemite compressor and coupler; purchased the fittings and took them away with him. He subsequently made other purchases of similar fittings for the same purpose. It thus appears in evidence that Lincoln sold the fittings upon the express understanding that they were to be used in combination with plaintiff's **compressor**

then exhibited to the salesman. At all times thereafter, Lincoln sold its peripherally grooved, headed, and shouldered fittings in commercial displacement of plaintiff's fittings with the knowledge and understanding that the Lincoln nipples thus sold could be used and would be used by the purchaser in conjunction with plaintiff's compressor and coupler part of the complete combination under the Butler patent.

This brings us, then, to the issue in this case; that of contributory infringement. If the combination of the Lincoln nipples with the plaintiff's hydraulic compressor and coupler embodies claim 2 of the Butler patent in suit and that claim is valid, then we have a clear case of contributory infringement.

The testimony shows a complete response of the combination of the Lincoln fittings and plaintiff's Alemite hydraulic compressor and coupler to claim 2 of the Butler patent. Every element included in claim 2 is included in such combination, and the demonstrations disclose that the co-operation and the functions thereof in this combination are the same as the combination of the plaintiff's compressor coupler, and fittings.

But defendant insists that claim is invalid. It relies largely upon the case of Stewart-Warner Corporation v. Jiffy Lubricator Co., 81 F.(2d) 786, 792 (C.C.A. 8). There the court held claim 1 of the Butler patent, while valid, not infringed by the Jiffy Company's sale of a certain coupler intended for use in conjunction with the cylindrically projecting end of an Alemite pin fitting. Claim 1 is not involved in this case. It included a fitting in the combination, and the claim is similar to claim 2, but the nipple is not headed. In the Jiffy Case, the nipple considered did not have head, throat, or shoulders. It was a perfectly smooth straight cylinder, and the Circuit Court of Appeals was of the opinion that the gripping action of the segmental jaws as disclosed in the Butler patent would not be sufficiently powerful to hold the coupler to such a plain, cylindrical nipple under the force of grease under pressure of several thousand pounds per square inch. The court said:

"But when we turn to the Butler patent specifications disclosing the 'means' he had in mind for 'compressively engaging about the nipple for locking said parts together,' we find no reference to any elements corresponding to such positive wedging means as above described. He describes a nipple having a head, a throat, and a shoulder, and segments adapted to slip over the head of such a nipple and embrace the throat thereof. Then he specifies spring fingers mounted on the forward face of the piston. Ample room is left in the cylinder for the free play of the spring fingers. As the piston is moved forward by the pressure of the lubricant, the spring fingers do engage and press upon the segments so that the segments are pressed upon the throat of the nipple. But the nipple is not specified to be held against longitudinal displacement by the force of the gripping. The language of the specifications is that the segments are held in position on the throat by the spring fingers, but it is the 'shoulder' on the nipple which 'prevents the retraction of the segments' or pulling away from the nipple. We conclude from consideration of all the specifications and the drawing that the inventor excluded disclosure of elements which would be actuated by the forward movement of the piston to lock the coupler to the nipple by any unyielding wedging action, but that he disclosed only such a yielding compression as should be accomplished by spring fingers. * * *

"We find the difference between the Butler patent and the Jiffy coupler substantial, in that the mechanical or engineering principle on which the Butler patent compresses the jaws of its chuck about the bearing nipple is different from that relied upon in the Jiffy structure. As they are not mechanical equivalents and as it does not appear that Butler invented or disclosed such a chuck as that made by Jiffy, there was no infringement."

Consequently, the opinion is of no aid in the decision of this case. Here we are dealing with a nipple of the character described by Butler in claim 2, with a head, a throat, and a shoulder. The coupler incorporates segments adapted to slip over the head of such a nipple and embrace or grasp the throat thereof. It is the shoulder on the nipple which prevents the retraction of the segments. The nipple discussed in the Jiffy Case, as the court pointed out, was not of such construction. It would not prevent longitudinal displacement by the force of the gripping of a compressor of Butler's type, although it would co-operate with the Jiffy compressor held not to infringe. It did not have the shoulder which prevents retraction of the

575

segments or the pulling away from the nipple. Lincoln sells a headed nipple, to be substituted for the plaintiff's headed nipple.. It has a head, a throat, and shoulders, and when used in conjunction with the Alemite hydraulic coupler, the segments of the coupler slip over the head of the defendant's nipple and embrace the throat thereof and clutch the head within the meaning of Butler's specifications and claims.

Defendant insists that this case is controlled by the recent decisions of the Supreme Court in Bassick Manufacturing Company v. R. M. Hollingshead Company (G. S. Rogers et al. v. Alemite Corporation), 56 S.Ct. 787, 80 L.Ed. ——, and it becomes necessary to examine those decisions with some care.

These cases went to the Supreme Court when the Gullborg patent was about to expire. The question of validity of the patents involved had been raised in many District Courts and the patents held valid and infringed in various Circuit Courts of Appeals. Unfortunately, the record was rather short. Plaintiff in the Hollingshead Case offered in evidence a sample of defendant's device and relied upon physical demonstration to show that uncoupling involved the suction effect of Gullborg.

From a decree finding infringement in the sale of the compressor and coupler of the type complained of, the Hollingshead Company appealed and argued that the device complained of had no suction effect. The Circuit Court of Appeals affirmed, 73 F.(2d) 543 (C.C.A.6). The Supreme Court took jurisdiction, and the question presented was as to the validity of the Gullborg patent, and whether the device complained of utilized the suction effect of the Gullborg claims. The Supreme Court held the claims valid, but said that the suction effect construction had not been proved and that the accused device did not involve the novel feature claimed in the patent. Clearly the case was determined upon a question of fact and the decision is of no help here, except in so far as it implies that if the device had been shown to be of the suction effect type, its manufacture and sale would have been held to constitute contributory infringement.

The language of the opinion indicates no intention to upset or to reverse anything that had been previously announced

as to the character of a combination patent. Such an invention is defined by Mr. Justice McKenna in Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, at page 332, 29 S.Ct. 503, 505, 53 L. Ed. 816, as follows: "A combination is a composition of elements, some of which may be old and others new, or all old or all new. It is, however, the combination that is the invention, and is as much a unit in contemplation of law as a single or noncomposite instrument. Whoever uses it without permission is an infringer of it. Whoever contributes to such use is an infringer of it. It may be well here to get rid of a misleading consideration. It can make no difference as to the infringement or noninfringement of a combination that one of its elements or all of its elements are unpatented."

In the companion case of Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, at page 318, 29 S.Ct. 495, 500, 53 L.Ed. 805, he said:

"A combination is a union of elements, which may be partly old and partly new, or wholly old or wholly new. But, whether new or old, the combination is a means — an invention—distinct from them. They, if new, may be inventions and the proper subjects of patents, or they may be covered by claims in the same patent with the combination.

"But whether put in the same patent with the combination or made the subjects of separate patents, they are not identical with the combination. To become that they must be united under the same co-operative law. Certainly, one element is not the combination, nor in any proper sense, can it be regarded as a substantive part of the invention represented by the combination, and it can make no difference whether the element was always free or becomes free by the expiration of a prior patent, foreign or domestic. In making a combination, an inventor has the whole field of mechanics to draw from. This view is in accordance with the principles of patent laws. It is in accordance with the policy of § 4887 of the Revised Statutes, which is urged against it."

I find nothing in the Hollingshead Case that purports in any way to disturb the previous announcements of the Supreme Court. Rather, it seems to me, the court reaffirms its adherence to its former holding.

██ It is well to observe that there are three classes of combination patents as follows:

(1) One or more old elements, plus one or more new elements.

(2) A plurality of elements, all of which are old.

(3) A plurality of elements, all of which are new.

Obviously to any trial judge, in their final analyses, almost all patentable combinations are of the second class; namely, those in which all of the elements are of themselves old. The old elements in a new valid combination, as the Supreme Court says, constitute invention and are as much a unit in contemplation of the law as a single or noncomposite instrument. There is no one element that can be said to be the gist of the combination, but it is the co-operative, co-ordinating, unified result, wherein the various elements contribute to one unitary result, which constitutes invention. It is misleading, therefore, to speak of any one element as the essence of the invention. Thus, in Automotive Parts Co. v. Wisconsin Axle Co., 81 F. (2d) 125, at page 126 (C.C.A.6), the court said: "The invention is for a composite thing, embracing several elements or parts, all of which are necessary to and co-operate in the operation of the patented unit. We cannot subscribe to the view that the test of contributory infringement in the furnishing of parts for a combination invention is whether the parts furnished constitute the gist or essence of the invention; indeed, we cannot see how it may be said that any one element or another marks the advance step or is the essence of such an invention. There are cases, it is true, in which the phrase 'essence of the invention' is used; but in our view, when the facts in those cases are considered, it cannot be said that the conclusions reached were the result of a logical selection of one or more elements of the combination as the gist or essence of the invention."

And the Supreme Court said in Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 29 S.Ct. 495, 500, 53 L. Ed. 805, "Certainly, one element is not the combination, nor, in any proper sense, can it be regarded as a substantive part of the invention represented by the combination."

The word "substantive" means "an essential part" or "constituent" or "relating to what is essential."

██ The question, of course, always, is whether there is a new patentable combination which produces a new and unitary result. The operation and functioning of all of the old elements of the new combination must be affected by their presence in the new combination and each part must contribute its part to the unitary whole. Otherwise, we have an unpatentable aggregation. But if the operation or functioning of each of the old elements is in some way affected by its presence in the new combination in such a way as to contribute to the accomplishment of a new and unitary result, then we have a valid patent claim.

In the Rogers Case, apparently, in the District Court the trial revolved about the question of whether the defendant sold its products with the knowledge that they would be used in conjunction with the parts sold by plaintiff. But in the Supreme Court this question of fact was abandoned and the defendant's contentions were that Gullborg patent was invalid and that the plaintiff was illegally extending its monopoly. The court held that the plaintiff might not extend the monopoly of its patent. But we do not understand that the decision in any way sought to review any prior announcement of the Supreme Court upon the subject of contributory infringement. The court did not so expressly hold, and I find in the opinion no such implication.

However, the court held that the evidence was that the prior art embraced the use in combination of a grease gun composed of a chamber or pump, a hose, a hose coupler, and a spring-closed fitting, the coupling being of the pin and slot or bayonet type. This prior art arose from Gullborg's earlier patent, No. 1,307,733, and the Seng French patent, No. 468,869. The court observed that the plaintiff's position was that when defendant furnished a gun, a part of this old unpatented and unpatentable combination, for use with the pin fitting of Gullborg, No. 1,307,733, it contributorily infringed claims 14 and 15 of the patent in suit, because those claims describe the combination of any grease gun with the patented pin fittings. For the invention of his fitting, Gullborg had previously applied for and obtained a patent, No. 1,307,733, not then in suit. Claim 15 of the Gullborg patent then in suit described a combination consisting of the pin fitting of Gullborg's patent, No. 1,307,733, with any grease pump having a bayonet type

coupler. The court said that the question then was whether claims 14 and 15, unless restricted to the combination of a grease gun and coupler and a pin fitting such as are described in the specifications of the patent, are void as attempting to extend Gullborg patent, No. 1,307,733, to the use therewith of any grease gun not having the suction device of the patent in suit. It held that though claims 14 and 15 are for a combination using a device of a prior patent, with grease gun or coupler of any type, they must be read as claiming only a combination of pin fittings and a gun, with coupling device having the suction effect set forth in Gullborg's patent; otherwise, the claims would be void as unlawful attempts to extend the monopoly of the pin fitting in patent 1,307,733.

The court observes that Rogers neither made nor sold pin fittings of the type covered by Gullborg, No. 1,307,733, and observed that the question was whether the patentee might further claim the combination between the patented pin fitting and any form of grease gun. He would thereby in effect be repatenting the old combination by reclaiming it with the improved element substituted for the old element. This the court said could not be done.

The thought underlying the court's remarks was that except for the suction-effect coupler combination, Gullborg had made but one invention; namely, his particular form of pin fitting; that his right to patent protection had been exhausted in his patent 1,307,733; and that he could not be permitted to extend the monopoly of this old patent. The court, in effect, reaffirmed Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 325, 29 S.Ct. 495, 53 L.Ed. 805.

The rather startling feature of the Supreme Court's opinion is the announcement that the Leeds Case patent to Berliner, No. 534,543, was a pioneer patent. I consider this unimportant, because evidently the Supreme Court has extended, intentionally or otherwise, the meaning of the word "pioneer," for in the Leeds Case the two earlier patents, 372,786 and 382,790, described and claimed substantially everything in Berliner, 534,543, then being considered, in the way of disc, record, cabinet, and record in phonograph machines. There was an improvement, however, which I shall later discuss. As a matter of fact, the original phonograph goes back to Edison's patent in 1878. Many other delvers in the art have procured patents since then, but Bell and Tainter, No. 341,- 214, includes most of the prior art. As compared with that, the Berliner invention consisted in permitting the stylus of the reproducer to be propelled by and along the sound groove of the record tablet all the way from its outer circumference to its inner end. To accomplish this, it made use of a mounting for the reproducer which would permit it to travel freely throughout this distance. Berliner's invention resided in giving the reproducer a greater degree of freedom of movement to follow the groove in the record, and, by doing so, eliminating the necessity of providing means for relatively shifting the record and reproducer. The new thing was the unrestricted pivotal mounting. This was pointed out by Judge Hazel in the trial court (Victor Talking Machine Co. v. American Graphophone Co. [C.C.] 140 F. 860) and by Judge Hough in the Circuit Court of Appeals in Leeds & Catlin Co. v. Victor Talking Machine Co., 154 F. 58, 23 L.R.A.(N.S.) 1027. Consequently, the statement of the Supreme Court in the Leeds Case that the patent was a pioneer must be taken into consideration with the record disclosing its place in the history of the art.

In Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 311, 29 S. Ct. 495, 53 L.Ed. 805, the court had to do with a combination consisting of the elements: (1) A traveling disc having a sound record formed thereon; (2) a reproducing stylus, shaped for engagement with the record and free to be vibrated and propelled by it. It was, therefore, a true mechanical combination device, producing by the co-operation of its constituents the result specified in the manner specified. The Leeds records were equally suitable for use in connection with the Victor machine as well as their own machines. The court held that there was contributory infringement.

The result was in general the old result of producing or reproducing articulate sounds. But the new and unitary result was the production of articulate sounds by the automatic swing of the stylus across the disc record; in this respect only the patent was a pioneer. Everything else was old. The new thing was the pivot or hinge for the stylus so that it might be propelled by the record all the way across the face of the record. The various elements pos-

sessed no utility without co-operation in combination. Each element was necessary to the operation of the whole.

From an examination of the Leeds opinion I believed that the basis of the decision relative to the Gullborg patent was that this inventor of pin fitting, part of the complete combination, part of which had already been separately patented, did not bring about any new mode of operation or co-operation in or among the other elements thereof. It did not alter or modify or give new functions to any of the other parts of the combination; and, therefore, the old parts did not participate in a new way in the accomplishment of a new and unitary result. As pointed out by Judge Thacher in the District Court in Bassick Mfg. Co. v. Adams Grease Gun Corporation 39 F.(2d) 904, 905, in discussing the Gullborg patent, where he says: "The novelty in Gullborg's fitting was merely in the use of the same pin to furnish bearings for the slot and an abutment for the spring, and it was only this specific form of construction which was patentable. Lyman Mfg. Co. v. Bassick Mfg. Co. (C. C.A.) 18 F.(2d) 29. Thus it will be seen that there was no functional novelty in combining such a pin fitting with a bayonet coupler and a grease gun. The old combination of the gun, the bayonet coupler, and a pin fitting with ball and spring valve would work as well and accomplish precisely the same result. To extend the combination claims to cover the use of any old gun and any old coupler on a Gullborg fitting is clearly not permissible in view of the prior art, which limits novelty in the pin fitting to a specific form of construction and deprives the aggregation of elements of all patentable novelty as a combination. Whether its elements be old or new a combination is an invention distinct from them."

The ground for decision appearing in these opinions is not applicable to the Butler patent, claim 2. Here the question is whether Butler produced a combination which achieved a new and unitary result by the co-operation of all the elements, whether all the elements have new or modified functions as a result of changes or substitutions, or whether the old elements have only the old functions operating and co-operating in the old way to produce only an old result. We have seen that the combination consists of seven elements, all of which are old; that invention arises not from any one element, but from the new unitary result. Defendant insists that the essence of the combination is the coupler, but we have seen this is a fallacious theory, for if it were correct and available to excuse the use of the nipple to co-operate in the combination, one person might make the nipple, another, the cylinder; another a group of jaws, another the sealing seat; another the piston. Each of these are old; each of them sell separately. The purchaser could quickly assemble them and then claim that each part had an independent status apart from that in the Butler combination. There could then be no infringement.

The headed nipple, which co-operates with the sealing seat and jaws of the coupler and thus with the piston and cylinder, is just as essential a part of the Butler invention as any of the several elements of the coupler. There is co-operation between the nipple and the jaws which produces the operation of the seal, which in turn effectuates the operation of the gripping jaws, making possible heretofore unachieved pressures. The headed nipple has new functions arising out of direct co-operation with the jaws. The head spreads the jaws of the coupler when the latter is attached and thus prepares the coupler for operation in bringing about a mechanically strong and lubricant tight joint. In detaching the coupler the head of the nipple engages and pushes the jaws outwardly. These in turn push the piston backward, thereby effecting the release of the coupler from the nipple. The presence and the action of the nipple are essential, because the nipple alone makes it possible to build up in the cylinder of the coupler a grease pressure which will force the jaws into gripping enforcement with the nipple. The nipple is not merely a receptacle. It becomes an element which coacts to influence and make possible the desired operation of the coupler mechanism.

Butler was the first to utilize a headed nipple and a compressor as co-operating elements of a combination whereby a grease-tight and mechanically strong connection between compressor and bearing were effected automatically in and by the grease pumping operation of the compressor alone.

The high pressure delivery of grease from the compressor to the interior of the bearing, due to the strong and grease-tight attachment of the grease gun to the grease passageway of the bearing, was a new,

useful, and unitary result. It could not be accomplished with anything less than the combination of all of the elements included in Butler. Each part of the combination performed new functions and operated and co-operated in new ways in order to accomplish the single new result. The invention of Butler resides in the combination and not in one specific element. Every one of the seven old elements' functions became essential factors in the new combination. The situation is not one where the language of the Supreme Court in the Gullborg Case (56 S.Ct. 787, 791, 80 L.Ed. ——) is applicable, for in the sense that the Supreme Court used the term pioneer, Butler is equally a pioneer. A completely new unitary result is achieved; something never accomplished before. Just as the Supreme Court said of the Berliner patent, "each element was necessary to the operation of the other."

What has been said with reference to the Hollingshead and Rogers Cases is equally applicable to the recent decision of Judge Schoonmaker in Stewart-Warner v. Rogers, and Stewart-Warner v. Universal Lubricating System, Inc., 15 F.Supp. 410, in the District Court for the Western District of Pennsylvania.

Defendant insists that the history of file wrapper is fatal to Butler's claim in view of the fact that the third claim was canceled and that the present claim construed as contended by plaintiff is equivalent to the rejected claim. I do not believe such result follows, for the plaintiff is not asking to have claim 2 interpreted or construed in such way as to include the mechanism of canceled claim 3. There is no estoppel as contended.

Defendant argues that to decree this combination valid is to deprive prior patentees of valid old elements included in the combination of their rights and to limit them and their uses. But we believe that the complaint is not well founded. Defendant is free to make and use the old articles for use in the old manner taught by the prior art, but when these old elements are included in the new combination, achieving a new and unitary result, we may not deny validity; "then, indeed, the protection which is promised by the constitution and laws of the United States to inventors is a poor sham. Many of the most valuable patents are combinations of nonpatentable elements, and the only effective mode of preventing infringement is by suits against those who, by furnishing the parts which distinguish the combination, make it possible for others to assemble and use the combination, and who, by advertisement of the sale of such parts and otherwise, intentionally solicit and promote such invasions of the patentee's rights." Thomson-Houston Electric Co. v. Ohio Brass Co., 80 F. 712, 721 (C.C.A. 6), opinion by Judge Taft.

Defendant argues at length that the sealing mechanism of Butler is not in combination with the gripping mechanism but constitutes mere aggregation. It is to be observed, however, that the operation of the gripping mechanism is absolutely dependent upon the operation of the sealing mechanism and that the operation of the latter is dependent upon the operation of the former. Each is dependent upon the other. Functioning in co-operation and co-ordination is necessary to produce the desired result. This is not aggregation.

A great deal of attention has been given to the argument that the Butler invention must be limited to a flimsy spring finger between the piston and the jaws of the coupler. Irrespective of the decision of the Circuit Court of Appeals for the Eighth Circuit (Stewart-Warner Corporation v. Jiffy Lubricator Co., 81 F.(2d) 786), the record of which is not before us, it is sufficient to say that the evidence here presented discloses clearly that the operability of the Butler invention was not dependent upon any particular degree of springiness; that the device will operate satisfactorily to accomplish all the results described by Butler, if the piston is rigid or very springy, or only slightly so. Furthermore, there is nothing in the claim of the Butler invention which does not apply to the rigid assembly of Butler's original device, in evidence, in the same manner as it applies to the flexible sample made and produced by defendant. Butler in no place makes any claim which recognizes as essential this factor. I cannot read into claim 2 any requirement of springiness or spring fingers.

Defendant cites certain prior art. Newton patent, No. 1,118,876, discloses a device for use in testing under pressures of 100 or 150 pounds per square inch the air brake hose couplings of cars in railroad trains. It includes no headed nipple, lubricant compressor, aperture for discharging grease, apertured sealing seat carried by a piston for engagement with the nipple, and nothing whereby the pres-

sure of the lubricant on the piston will move the said element to compress forcibly while the lubricant is passing through the connecting parts. It teaches nothing of what Butler achieved. The modified structure produced by the defendant I believe does not follow the teaching of Newton. It is impractical for Newton's purposes, and does not teach what Butler taught.

Defendant insists that Lincoln cannot contributorily infringe the Butler patent because plaintiff's coupler part is not constructed according to the Butler patent, and claim 2 does not properly cover plaintiff's hydraulic apparatus. I believe the premises are not well founded, but that plaintiff's construction follows the teaching of claim 2.

■ Defendant contends that nonuse of Butler device for some time renders the patent therefor subject to a strict construction, and that it should be construed so that it will not be infringed by Kleenseal fittings. It seems that Butler did not manufacture under his patent for two or three years, but immediately upon the purchase of the patent, plaintiff began to manufacture under the same and put its product into the widest possible commercial use, and such use has grown to the extent that the combination is used on 99 per cent. of the automobiles made and sold in America. This success had been attained a year prior to the commencement of manufacture and sale of the nipple of defendant. There is no legal reason why, when commercial success has resulted and a late infringer seeks to defend, he should be allowed to say that the patent is limited in some way because in the first two or three years of its life no manufacture took place. There is estoppel where defendant did not begin its manufacture until after commercial success had been achieved by the new owner of the patent.

Defendant contends that its nipples may be used in association with compressors and nozzles other than those of the Butler patent. To my mind this is an unimportant fact. The round-headed and straight-sided nipple which defendant first designed could be used with all of these other compressors, but could not be used with devices built in accord with Butler. When defendant changed from a noninfringing device which it could use with other nozzles, to infringing devices which could be used and were intended to be used in combination with plaintiff's couplers, it began its infringement.

As Walker on Patents (6th Ed.) p. 554, said:

"But where the machine or other property thus furnished, is useful for some other purpose than to be a part of a patented combination, or to make a patented article, or to be operated upon by a patented machine, or to be used in performing a patented process, and where he who furnishes the property, does not intend or know, when furnishing the same, that it is to be thus used, he incurs no liability to an action for infringement.

"But if he knew or intended that the property furnished by him was to be used in either of the infringing ways, he cannot defeat an action for infringement, by showing that the furnished property could have been used in some non-infringing way.

"In the absence of specific proof of knowledge or intent, the fact that the property furnished could be used with an article or machine which in itself could not be an infringement and that there are many such articles or machines in use is sufficient to absolve one who supplies such property from the charge of infringement."

■ I conclude, therefore, that claim 2 is a valid patentable combination; that the defendant's fittings sold, with the knowledge and understanding that the same were to be used in co-operation with the Alemite compressor, are a contributory infringement, and that there is nothing in defendant's contentions to avert the resulting consequences.

The findings of fact and conclusions of law incorporated herein will be included in my formal findings and conclusions adopted this date.