**Q–TIPS, INC. v. JOHNSON & JOHN-SON (two cases).**

Civ. A. 10415, 28449.

United States District Court
D. New Jersey.

Nov. 20, 1952.

848

Shanley, Congleton & ·Fisher, Newark, N. J. (Pennie, Edmonds, Morton, Barrows & Taylor, by W. Brown Morton, and W. Brown Morton, Jr., all of New York City, Stanton Lawrence, Jr., Rutherford, N. J., of counsel), for plaintiff.

Kenneth Perry, New York City (Stewart W. Richards and Arnold S. Worfolk, New York City, Herbert E. Bailey, New Brunswick, N. J., of counsel), for defendant.

FORMAN, Chief Judge.

Plaintiff, Q-Tips, Inc., a New York corporation, instituted two suits against defendant, Johnson & Johnson, a New Jersey corporation. The complaint in Civil Action No. 10,415 alleged infringement of plaintiff's Patent No. 1,921,604 of August 8, 1933,[1] relating to a machine for manufacturing medical swabs (hereinafter referred to as cotton tipped applicators or applicators) by defendant's making, selling, and using a similar cotton tipped applicator machine. Plaintiff demanded an injunction and damages.

Johnson & Johnson's answer denied infringement and urged invalidity of the patent in view of the prior art, lack of invention, non-compliance with the patent statutes with respect to describing and claiming the alleged improvement, and failure of the Patent Office to cite and properly apply the most relevant art. In addition, the answer alleged misuse of the patent and also certain grounds of unfair competition including false patent marking of the unpatented goods with respect to which the parties compete, interference with defendant's stick supply and advertising to the trade in such a manner as to cause defendant's customers to believe defendant was infringing a product patent. A counterclaim alleged that Q-Tips, Inc., had attempted unlawfully to restrain trade and commerce and to secure for itself an unlawful monopoly of the business of selling cotton tipped applicators. Defendant demanded that the complaint be dismissed, that Q-Tips, Inc.'s patent be adjudged invalid and not infringed and that an injunction issue restraining it from prosecuting any claim for infringement of. the patent or from doing other enumerated acts involving Johnson & Johnson or its privies and that it pay treble damages.

Q-Tips, Inc., brought its second suit (Civil Action No. 284–49) under the United States trade-mark laws, alleging as a first cause of action that since prior to January 1, 1926, it had engaged in the "manufacture and sale of swabs for use as medical applicators, in baby care, for cosmetic purposes and many other uses;" that the swabs consist of sanitary absorbent cotton attached to one or both ends of small sticks of wood and are packaged and sold under the trade-mark "Q-Tips", for which a certificate of registration had been issued on July 9, 1934, under serial no. 309256 and that Johnson & Johnson subsequent to November of 1948 has infringed upon its trade-mark rights by using in commerce the name "Cotton Tips" in connection with the sale of applicators for the same purposes as those of Q-Tips, Inc., and in competition therewith.

For a second count Q-Tips, Inc., complained that Johnson & Johnson by its use of the name "Cotton Tips" and the appearance of its packages caused confusion upon

---

1. The patent in suit is regarded as if in force at this writing although, in fact, it expired during this litigation.

the part of the buying public and unfairly competes with the Q-Tips product.

Q-Tips, Inc., prayed for an injunction to restrain Johnson & Johnson from using the name "Cotton Tips"; from infringing upon its trade-mark "Q-Tips"; from unfairly competing with it in the use of the name "Cotton Tips" or in any other name having the dominant word "tips" in it or in using a package having the dress and appearance of its package and from continuing its campaign of "wilful and malicious dilution of the distinctiveness and value of plaintiff's trade-mark by using and inducing others to use the word 'tips' as a term generically descriptive of swabs or applicators." It also sought an accounting.

Subsequent to the filing of the original complaint Q-Tips, Inc., filed an amended and supplementary complaint incorporating the first two counts as originally filed, and adding a third cause of action in which it alleged that Johnson & Johnson had formulated a plan or scheme, wilfully and maliciously, to destroy the value of the plaintiff's trade-mark "Q-Tips" in furtherance of which it embarked upon a campaign to create for the word "tips" a new meaning which it had never theretofore had, namely, swab or applicator. It alleged that Johnson & Johnson designed to cause the word "tips" to become accepted as the principal generic term for the article described, thus diluting the value and distinctiveness of plaintiff's trade-mark "Q-Tips". It prayed for damages (compensatory and punitive) on account of the infringement and a judgment that damages should be trebled.

Johnson & Johnson filed an answer to the amended and supplementary complaint in which it denied the validity and infringement of the trade-mark "Q-Tips" or that by the use of the words "Cotton Tips" or the appearance of its packages it has unfairly competed with Q-Tips, Inc., and sought to create for the word "tips" a new meaning designed to dilute or destroy the value and distinctiveness of the trade-mark of Q-Tips, Inc. It averred that its use of the words "cotton" and "tips" individually or together in the form of "Cotton Tips" is a use other than as a trade-mark, of a term or device which is descriptive of and used fairly and in good faith only to describe to users a product manufactured and sold by it which consisted "of a small stick of which one or both tips are provided with absorbent cotton."

The answer also alleged that the term "cotton tips" has been used by manufacturers for years to describe such goods without objection by plaintiff; that because of plaintiff's conduct the word "Tips" in "Q-Tips" has never had any significance as an indication of origin and that "tips" has been used by the trade and public to indicate such goods; that the term "Q-Tips" has become the common descriptive name of a product on which a product patent has expired; that as a result of plaintiff's abandonment of the alleged trade-mark "Q-Tips", said mark has lost its significance as an indication of origin and has been used by the trade and public as the generic name of such product; that plaintiff has used the term "Q-Tips" exclusively in connection with this type of product so that the term now means to the public a certain type of applicator that may be made by any manufacturer; that plaintiff has engaged in false patent marking and an attempt to secure a monopoly as noted in connection with the patent suit; and that when plaintiff adopted the mark "Q-Tips", the use of the word "tip" or "tips" by its predecessors and others had been such as to already have diluted any value or distinctiveness in said mark on cotton tipped applicators, and since then, and long before defendant began to use the term "Cotton Tips", plaintiff by acts of commission and omission continued to dilute and destroy any alleged value and distinctiveness of the mark.

A counterclaim was entered similar to that filed with the answer in the patent suit. The defendant sought judgment dismissing the complaint, adjudicating that the mark "Q-Tips" is invalid, that plaintiff's registration of "Q-Tips" be cancelled, that the plaintiff be enjoined from prosecuting the patent suit, that plaintiff be enjoined from engaging in restraint of trade and unfair competition with respect to defendant, and that the defendant be awarded treble damages, costs and attorneys' fees in con-

sequence of plaintiff's monopolistic and unfair practices.

Defendant moved for summary judgment in the patent case grounded on the contention that plaintiff was barred from suing on its patent having misused it by licensing applicator making machinery embodying the alleged invention of Patent No. 1,921,604, in which licenses plaintiff limited either the use of the licensed machines to the manufacture of unpatented applicators having a cotton tip at one end of the stick only, or the number of the unpatented applicators that could be made by the licensee where the license permitted manufacture of applicators with cotton swabs at both ends of the stick. Defendant moved for summary judgment in the trade-mark case on the ground that various of its defenses were supported by such an overwhelming assemblage of evidence that there was no issue as to any material fact and that visual comparison of plaintiff's packages with those of the defendant conclusively negated any inference of fraud or unfair competition. The motion was denied in each case for the reasons set forth in an opinion filed September 4, 1951.

At a pretrial conference held in both cases they were consolidated for trial.

### The Patent Case (C–10,415)

Both plaintiff and defendant manufacture a product consisting of a stick one-tenth of an inch in diameter,[2] two and seven-eighths of an inch long,[3] and with a swab of cotton wrapped around each end of the stick. The primary use of these double tipped applicators is in the care of babies, where they are employed for such purposes as cleaning nostrils and ears.[4] It would appear that the first commercial producer of cotton tipped applicators was a Mrs. Forbis, who manufactured them in her home.[5] She also owned a patent on the article, numbered 1,652,108, dated December 6, 1927, and sold the product under the appellation Baby Nose-Gay.[6] In 1925 The Leo Gerstenzang Co., Inc. purchased an assignment of the product patent from Mrs. Forbis.[7]

Plaintiff, Q-Tips, Inc., was incorporated in New York on January 30, 1929,[8] and on February 6, 1929, The Leo Gerstenzang Co., Inc. transferred its business to plaintiff.[9] On January 2, 1937, plaintiff's president, Mr. Leo Gerstenzang, and his wife Mrs. Ziuta Gerstenzang formed a partnership and purchased from plaintiff "All merchandise, machinery and fixtures now contained in the premises—132 W. 36th Street and used by said Q-Tips, Inc., for the manufacture of Q-Tips or medicated swabs together with the accounts receivable of said Q-Tips, Inc." The contract recited that plaintiff was the owner of patents covering the manufacture of applicators.[10]

The partnership manufactured and sold the product until December 28, 1945, when by agreement it sold back to the plaintiff certain assets used in the manufacture and sale of its applicators.[11] Plaintiff then resumed the manufacture and sale of the product. On December 5, 1945, Q-Tips Sales Corporation was organized in New York,[12] and on December 29, 1945, the partnership sold the Sales Corporation certain assets in exchange for stock.[13] During all this time Mr. and Mrs. Gerstenzang had been the principal owners of the business and in control of it.[14]

Cotton-tipped applicators were originally manufactured by hand,[15] at which time the average worker could produce about 800 during an eight hour day.[16] Mr. Gerstenzang then developed a machine consisting of two wheels between which an applicator

2. Transcript, pp. 105, 163.
3. Transcript, p. 163.
4. Transcript, pp. 196–246.
5. Transcript, p. 16.
6. Exhibit DHH 36.
7. Exhibit DHH–DII.
8. Exhibit DHH–DII.
9. Ex. DHH–56; Ex. DHH–DII.

10. Exhibit DHH 58; Exhibit DHH–DII.
11. Exhibit DHH 59; Exhibit DHH–DII.
12. Exhibit DHH–DII.
13. Exhibit DHH–DII.
14. Exhibit DHH–DII.
15. Transcript, p. 8.
16. Transcript, p. 10.

stick would be held by a fork device and by means of which the stick would be twirled. As the stick was twirled an operator would apply cotton to its ends.[17] Two operators were required to run this machine, one to insert the stick between the wheels and one to apply the cotton.[18] There resulted an increase in production to about 2,500 or 3,000 applicators per day per girl.[19]

Following this initial mechanization of the manufacturing process, Mr. Gerstenzang developed an apparatus for making applicators which is embodied in the United States Patent 1,721,815, issued to the plaintiff July 23, 1929, and which must be described in some detail as it is so closely related to the plaintiff's subsequent machine which is in suit and to the accused machine owned by Johnson & Johnson.

This mechanism, which shall hereinafter be referred to as the Gerstenzang machine, was designed so that it could twirl applicator sticks, leaving their ends exposed in such a position that a single operator could apply a wad of cotton at each end of the twirling stick. The machine was provided with a hopper to supply untreated sticks. A roller drew these sticks from the hopper one at a time and introduced them into the so-called stick carrier, which consisted of two parallel discs mounted about two inches apart so that the ends of the two and seven-eighths wooden sticks protruded slightly to permit placing cotton wads thereon. In each of the discs was a series of grooves or notches into which the sticks fitted.

Between the discs of the stick carrier and mounted on the same axle was a revolving roller. Its radius was less than that of the discs; so that the sticks were not prevented from falling into the grooves. Another revolving roller was in place above the first one, constructed in such a manner that it could be moved away from the lower one to permit a stick to be brought between the two rollers. The upper roller could then be lowered into contact with the stick in order to twirl the stick rapidly.

Though the rollers moved constantly in a counter-clockwise direction, the stick carrier, between whose discs was mounted the lower roller, moved only intermittently. When the machine commenced operation, a stick would be fed from the hopper into the first set of stick carrier grooves. Next the stick carrier would step one position. The stick would be advanced to a spot between the rollers, the top one of which would be lowered in relation to the bottom roller so as to twirl the stick. The operator would apply a wad of cotton at each end of the twirling stick. Simultaneously another stick would be fed from the hopper into the second set of stick carrier grooves. At the next step of the stick carriers the second stick would reach the twirling position, the first would be carried beyond it, and a third would be fed into the third set of grooves of the stick carrier. Continued operation of the machine would result in the constant repetition of this process.

The stepping, or indexing, of the stick carrier of the Gerstenzang machine was accomplished by means of a rotating arm, which engaged a series of spaced pins protruding from the external surfaces of the stick carrier. As the arm rotated, it hit a pin, pushed it upward until the arm became disengaged. The upward motion of the pin advanced the stick carrier one step. The arm completed its circle while the stick carrier was held stationary by a spring detent provided for the purpose. As the arm came around once more to engage the next pin and push it upward, the stick carrier would step again. While the stick carrier was in repose, the stick twirling function was performed.

The Gerstenzang machine was used for about four years and resulted in a substantially increased output.[20] The next step was the elimination of the manual operations. About the year 1929 Mr. Gerstenzang approached Mr. Earl Bunnell and Mr. Leslie Barnes, designers of automatic machinery, to request that they effect this improvement,[21] which they undertook to

17. Transcript, p. 9.
18. Transcript, p. 9.
19. Transcript, p. 10.

20. Transcript, pp. 11, 12.
21. Transcript, pp. 119, 120.

do and which, after over one-half of a year's work,[22] resulted in the machine in suit, covered by United States Patent 1,921,604, which will hereinafter be referred to as the Bunnell machine.

What, in effect, the Bunnell machine accomplished was to add to the Gerstenzang machine a device to break off bits of cotton and provide mechanical fingers on arms to carry the cotton wads to the ends of the twirling stick and shape the swabs. In describing the operation of this machine it is convenient to catagorize it as consisting of three mechanisms. The first is the stick carrying and stick twirling mechanism. This incorporates almost unchanged the entire Gerstenzang machine just described, including the method of stepping the stick carrier.

The second mechanism is the cotton feeding and cotton breaking mechanism, one of which is mounted on each side of the stick carrying and stick twirling mechanism. It consists of a cotton feed and two pairs of jaws located one behind the other. A strand of cotton is introduced into these jaws and is fed forward thereby. With both pairs of jaws in the forward position and with the continuous strand of cotton located between them, the rear jaws first and then the front jaws close to grip the strand. The rear jaws then move rearwardly while the front jaws remain stationary to break off a wad of cotton. Thereafter, the front jaws move rearwardly to feed the cotton strand ahead.

The third mechanism involves the transfer of the wad so broken off to the ends of the twirling stick, and, like the cotton feeding and breaking mechanism, one is mounted on each side of the stick carrier and stick twirling device. It consists of a pair of steel fingers which aproaches to receive the wad of cotton broken off by the jaws. As the fingers approach a wad inserter arm moves laterally from the opposite side and tucks the wad between the fingers. The rear pair of cotton gripping jaws swings open to release the broken

off wad of cotton as it is grasped by the fingers, and simultaneously therewith the front pair of jaws swings open too. Both pairs of jaws then move forwardly along the cotton strand to their initial positions ready to repeat the cycle. The fingers with the broken off cotton wad grasped between them move outwardly and rearwardly until located in axial alignment with the twirling stick in the stick carrier. The fingers move inwardly toward the end of the twirling stick to apply the wad thereto and to form it into a cotton swab in a manner closely simulating the actions of human fingers performing the same operation.

After forming the cotton swab on the end of the stick, the fingers move forwardly away from the stick and then forwardly and outwardly to their initial position ready to grasp the next wad of cotton in the next cycle.

All that is necessary to connect Bunnell's contribution to the Gerstenzang machine is to lengthen the drive shaft of the latter.[23] The proper timing of the many operations of the Bunnell machine and the advancing and retreating of its mechanisms is effected by means of numerous, varied shaped cams, located on the turning cam shaft, which act to move parts in one direction against spring tension. The spring tension returns a part after the cam finishes its action on that part.[24]

It appears that in about 1930 by use of the Bunnell machine the output of cotton tipped applicators was forty to fifty a minute per machine,[25] but that plaintiff, which is still utilizing this machine, by effecting improvements thereon, has increased its rate of output somewhat.[26]

In 1947 defendant began manufacturing cotton tipped applicators, using the machine which plaintiff alleges infringes the Bunnell patent, and which is itself patented in United States Patent 2,576,068. This machine also employs a stick carrier similar to that in the original Gerstenzang invention. It receives sticks from a hopper; the car-

22. Transcript, p. 127.
23. Transcript, pp. 130, 131.
24. Transcript, pp. 953, 954.

25. Transcript, p. 126.
26. Transcript, pp. 126, 178.

rier contains eight notches in its circumference devised to hold the sticks. It operates intermittently, moving one-eighth of a revolution at a time. Cotton wads are picked up in a manner which will be described in more detail, and the stick twirling operation is performed. There are rubber tired rollers which twirl the sticks as they are introduced between them, but they are not located one above the stick carrier and one between the two discs forming the outer edges of the carrier as in the Gerstenzang machine. Instead, there is located on each side of the stick carrier, at an interval of four steps or five notches of the machine beyond the opening of the hopper, a pair of rubber tired rollers continuously rotating in the same direction. These normally are spaced so as to admit the oncoming stick between them. When a stick dwells in the twirling position, the rollers move in to engage opposite sides of the stick, inwardly from its ends, and twirl it rapidly. Appropriately shaped roll sections adjacent to and outside of the rubber-tired rollers reduce the cotton wads on the protruding stick ends into the desired swab form.

Intermittent motion of the stick carrier is effected by a somewhat different mechanism than that in the Gerstenzang machine and this different mechanism is described in the Ganz Patent 2,521,211. Instead of employing a rotating arm to contact and advance a pin on the stick carrier, the accused machine uses an arm which rocks and oscillates at one end while the other end makes a circular movement. The intermediate part of the arm conveys a pin on the so-called indexing ring from one position to the next, causing the indexing movement. An eccentric, rotating disc at one end of the arm fits into a curved portion of the indexing ring, locking it in position and performing the same functions as the lock pin and spring detent in the Gerstenzang machine.[27] This locking arrangement, however, lacks the shock of engagement and release which is found in the

Gerstenzang device and permits greater operating speed.[28]

The accused machine performs the cotton feeding and breaking functions by means of a series of five pairs of rollers rather than by means of opening and closing jaws as in the Bunnell device. A series of these pairs of rollers is located on each side of the stick carrier. A strand of cotton is fed into these rollers from a cotton supply. The first three pairs, called draw rollers, operate intermittently but all at the same time, each moving a little faster than the pair before it in order to draw out the cotton, thus performing the function of draw frames. The fourth and fifth pairs of rollers, the fourth known as break off rollers and the fifth as transfer rollers, operate continuously, the fifth moving slightly more rapidly than the fourth. A wad is broken off from the strand of cotton when the draw rollers stop while the break off and transfer rollers continue turning, tearing away the cotton wad located therein from the main portion of the cotton strand.[29]

When a wad is torn off, the Bunnell machine would transfer it to the ends of the twirling stick by means of mechanical fingers and a wad inserter. This mechanism is not employed by the accused machine. After a cotton wad is broken off it moves between the transfer rollers onto cotton supports, which are shaped to provide a curved slot coinciding with the rim of the stick carrier. The outer discs of the stick carrier are at a lesser distance from each other than the length of the sticks, so that the stick ends project beyond the discs. The slot between the cotton supports is in line with the path of movement of the projecting ends and therefore a stick end will engage a cotton wad resting on the cotton supports midway of its length. Continued rotation of the stick causes the cotton to fold once around the stick in the form of a U before the stick is carried between the stick rotating

27. Transcript, pp. 1029–1033.

28. Transcript, p. 1034.

29. Transcript, pp. 748–750.

854

and cotton forming rollers, whose operation has already been touched upon.

Thus it can be seen that the accused machine uses a stick carrier and stick twirling device very similar to that used by the Gerstenzang machine. Its intermittent motion is effected by a different type mechanism. The accused machine substitutes intermittent and continuous rollers for the moving jaws of the Bunnell machine to tear off pieces of cotton. The accused machine does not employ mechanical fingers and arms to transfer a wad to the end; instead it depends upon the stick ends themselves to pick up wads deposited by the transfer rollers upon cotton supports located in the path of the stick ends. With its machine defendant is able to produce three hundred applicators a minute,[30] a considerably greater rate of production than that of plaintiff.

Plaintiff relies upon claims 1 through 10, 16, 21, 22, and 23 of the patent in suit as those infringed by the accused machine.[31]

30. Transcript, p. 754.

31. "(1) In a machine for making swabs, means for supporting a stick with an exposed end, and means for grasping and applying a wad of cotton to the exposed end of such stick and means for withdrawing the stick from said supporting means with the wad thereabout.

"(2) In a machine for making swabs, means for supporting a stick with an exposed end, and means for grasping and applying a wad of cotton to the exposed end of such stick, one of said means imparting a twirling motion to the material it holds for fixing said wad about said end, and means for removing the stick.

"(3) In a machine for making swabs, means for successively supporting and twirling a plurality of sticks with exposed ends so that a wad of cotton applied to such ends will form a swab thereover, and means for grasping and applying a wad of cotton successively to the exposed ends of such sticks.

"(4) In a machine for making swabs, means for supporting and twirling a stick intermediate its ends so that wads of cotton applied to said ends will form swabs thereover, and means for applying wads of cotton to said ends.

"(5) In a machine for making swabs, means for supporting and twirling a stick intermediate its ends so that wads of cotton applied to said ends will form swabs thereover, and mechanism for forming wads of cotton from a supply and applying them to said ends.

"(6) In a machine for making swabs, means for supporting and twirling a stick and means positioned adjacent an end of said stick for automatically applying a wad of cotton thereto during the twirling and means for conveying the stick with the swab thereover away from said application means.

"(7) In a machine for making swabs, a traveling member having spaced stick supports, and means synchronized with said members for grasping and applying wads of cotton successively to the sticks in said supports."

"(8) In a swab making machine having a stick support, a cotton holding member, and means for automatically forming wads of cotton and feeding them to the position of the stick support."

"(9) In a swab making machine, a cotton wad forming mechanism including a plurality of means for grasping a strand of cotton at spaced points, and mechanism for moving said means relatively for tearing off a wad of cotton."

"(10) In a swab making machine, a cotton wad forming mechanism including a plurality of means for grasping a strand of cotton at points, mechanism for moving said means relatively for tearing off a wad of cotton and means for conveying said wad to the point of application."

"(16) In a swab making machine having a stick supporting device and a device for supporting a cotton wad in alignment with the send of said stick, means for moving the material supported by one of said devices toward and into overlapping relation with the other material and means for concurrently rotating one such material relative to the other."

"(21) In a swab making machine, a receptacle for holding a strand of cotton, means for grasping and holding said strand, mechanism for grasping and pulling said strand away from said means thereby separating a wad therefrom, and means for transferring the cotton wad from said last named mechanism to the point of application."

"(22) In a swab making machine, means for supporting a stick on which a swab is to be formed, means for grasping a wad of cotton and conveying it to a position adjacent said stick, mechanism for bringing the wad and stick into engagement, and means for applying the wad about the stick end by twirling one

Each claim covers some or all of the three mechanisms previously described which are employed by the Bunnell machine. The stick carrying and twirling mechanism is included along with either the cotton feeding and breaking mechanism or the wad transfer mechanism or both in every claim except 9, 10 and 21, for with the exception of those three, each claim includes language equivalent to that in claim 3, "means for successively supporting and twirling a plurality of sticks with exposed ends." That language must refer to the old Gerstenzang machine. Claim 9 describes only the cotton feeding and breaking mechanism.

Claims 10 and 21 describe the cotton feeding and breaking mechanism and the wad transfer mechanism. The defendant asserts that these claims are no more than a non-patentable aggregation of four elements (Defendant treats the wad inserter as a fourth element rather than as a part of the wad transfer device.), each of which would operate as well whether or not the three others were present. Dispositive of the question whether a combination patent is a mere aggregation or not is the presence or lack of invention, for if the combination shows invention it is patentable; if it does not, it is unpatentable, or, in the language of many cases, it is a mere "aggregation." Great A & P Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

In that case the Supreme Court emphasized that care should be exercised when examining combination patents, stating:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sus-

tained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. * * *" 340 U.S. at pages 152, 153, 71 S.Ct. at page 130.

Lincoln Engineering Co. v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S. Ct. 662, 82 L.Ed. 1008, concerned a patentee who invented an improved coupling member for a well known lubrication device consisting of a fitting member, a pump, a hose and a coupler, and who patented his improvement in combination with the old elements. The patentee sued the defendant for contributory infringement and was successful in the District Court, Stewart Warner Corp. v. Le Vally, D.C., 15 F. Supp. 571; Id., D.C., 16 F.Supp. 778 and in the Court of Appeals, Lincoln Engineering Co. v. Stewart Warner Corp., 7 Cir., 91 F.2d 757. Reversing, the Supreme Court wrote:

"Butler may have devised a patentable improvement in such a chuck in the respect that the multiple jaws in his device are closed over the nipple by the pressure of the grease, but we think he did no more than this. As we said of Gullborg in the Rogers Case [Rogers v. Alemite Corp., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251], having hit upon this improvement he did not patent it as such but attempted to claim it in combination with other old elements which performed no new function in his claimed combination. The patent is therefore void as claiming more than the applicant invented. The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new

of said materials while they are in engagement."
"(23) In combination, mechanism for supporting and twirling a stick, a receptacle for a strand of cotton, means for grasping the strand at spaced points,

mechanism for causing said means to separate a wad of cotton from said strand, and means for picking up said wad and applying it on the twirling stick."

or different function or operation than that theretofore performed or produced by them, is not patentable invention. And the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination." 303 U.S. at pages 549, 550, 58 S.Ct. at page 664.

■ The reasoning employed in the Lincoln Engineering Co. case renders invalid all those claims of the patent in suit which attempt to include within their scope the stick carrying and stick twirling mechanism covered by the Gerstenzang patent 1,721,815 which expired on July 23, 1946. The Bunnell machine incorporates the Gerstenzang machine virtually without change. The latter machine performs no new or different function or operation by virtue of being united with the cotton feeding and breaking mechanism and the wad transfer mechanism. Its patent having expired, the public may employ the ideas it embodies, and may not be prevented from so doing by its being patented along with improvements as a combination patent. Consequently, claims 1 through 8, inclusive, 16, 22 and 23 are invalid for claiming too much.

Turning to the remaining claims, 9, 10, and 21, it must be determined if the mechanisms they describe show invention. Claim 9 refers to the cotton feeding and breaking mechanism, which includes the two pairs of jaws on each side of the machine which have already been described. Claims 10 and 21 refer to the cotton feeding and breaking mechanism and also to the wad transfer mechanism, which has also been described.

■ In my opinion these two mechanisms, combined, exhibit invention. Prior to their utilization an operator was needed in front of each applicator machine of the Gerstenzang type to apply cotton by hand to the stick ends. Using the improvements described in these claims the wad forming and applying operation was mechanized; one operator was able to tend three machines,[32] the speed of operations was increased; the resulting product was more sanitary. Far more than the mere substitution of a machine for human hands was accomplished. See Hildreth v. Mastores, 1921, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112. Examination of the mechanisms which achieved these results reveals an ingenious arrangement of cams, levers and springs which function with precise timing. Where a patentee claims an invention separately as well as in combination with the old elements which perform no new function, a court may allow the separate claims and disallow the combination claims. Bassick Mfg. Co. v. R. M. Hollingshead Co., 1936, 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251. Here the Bunnell improvement advanced materially the art of making cotton tipped applicators and his contribution was worthy of protection. Claims 10 and 21, which do not include the old Gerstenzang machine, were valid. Claim 9, directed solely to the cotton feeding and break off mechanism, adequately protected that part of the improvement which it describes.

## II

The defendant maintains that the plaintiff cannot assert his invention as it has not been adequately claimed pursuant to 35 U.S.C.A. § 33,[33] which provides that an

32. Transcript, p. 1290.

33. "Before any inventor or discoverer shall receive a patent for his invention or discovery he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; and in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery. The specification and claim shall be signed by the inventor.

inventor shall particularly point out and distinctly claim the part, improvement, or contribution which he asserts as his invention or discovery. Inasmuch as we are concerned only with claims 9, 10 and 21, there is no need to discuss defendant's objection to the others. Defendant objected to 10 and 21 on the grounds that they make their claims in terms of function instead of pointing out a patentable combination. Claim 10 was also objected to for the reason that it does not specifically include the wad inserter, without which the wad transfer mechanism will not function, and that, therefore, claim 10 is directed to an inoperative structure.

 . Claims are not to be examined in vacuo; they are to be construed with the specifications in mind. The Court of Appeals, Third Circuit, has stated, "The claims of a patent must always be explained by and read in connection with the specification and in the light of definitions and admissions made by the applicant in the proceedings in the Patent Office." Westinghouse Electric Corp. v. Hanovia Chemical & Mfg. Co., 3 Cir., 179 F.2d 293, 296–297.

Read in connection with the specifications the phrase in claim 9 "a cotton wad forming mechanism including a plurality of means for grasping a strand of cotton at spaced points, and mechanism for moving said means relatively for tearing off a wad of cotton" clearly refers to the pairs of jaws located on each side of the machine which operate to tear off wads of cotton. The same device is adequately described in claim 10 by the phrase "a cotton wad forming mechanism including a plurality of means for grasping a strand of cotton at spaced points, mechanism for moving said means relatively for tearing off a wad of cotton" and in claim 21 by the words "a receptacle for holding a strand of cotton, means for grasping and holding said strand, mechanism for grasping and pulling said strand away from said means thereby separating a wad therefrom." The

mechanical arms and fingers, with which the wad inserter functions to push the cotton into the fingers, are described in great detail in the specifications, and the manner of their operation is similarly disclosed. There is no question but that they are included in claim 10 by the language "means for conveying said wad to the point of application" and in claim 21 by the language "means for transferring the cotton wad from said last named mechanism to the point of application."

Read in connection with the specifications it is my conclusion that these claims point out a patentable invention and that as the wad inserter is described in the specifications as functioning in conjunction with the arms, claim 10 is not directed to an inoperative structure.

## III

The defendant contends that if the language of the Bunnell claims is broad enough to include within its scope the intermittent draw rollers, the continuous break off rollers, the continuous transfer rollers and the cotton supports of its machine, (Patent No. 2,576,068), the Bunnell claims are invalid because they were anticipated in the prior art. Defendant cites numerous devices which it asserts incorporate these ideas.

In the Johnson & Johnson sanitary napkin machine, in use more than two years prior to the filing date of the Bunnell patent, cotton is fed over a support through a pair of intermittent rollers and then through a pair of continuous rollers which break off the cotton and deliver the detached pieces onto a belt. The Sewall patent 1,434,917 of November 7, 1922, covers a machine for breaking a web of cotton batting into short pieces. The material first goes through a folding mechanism and then through intermittently operating rollers into continuously operating ones. The latter rollers are turned by a hand crank, and at a certain point a pin hits a lever causing the intermittent rollers to stop until the cotton web has cleared the

No plant patent shall be declared invalid on the ground of noncompliance with this section if the description is 

made as complete as is reasonably possible." 35 U.S.C.A. § 33.

continuous rollers. The Fortier patent 1,755,109 granted April 15, 1930, concerns a machine for making dental rolls which consist of a length of cotton rolled over itself tightly, impregnated and dried so as to form a round stick that can be cut into various lengths for use in medical or dental work. In this device also the cotton material first passes through intermittent rollers and then through continuous ones. The pieces thus broken off are passed out onto a belt for further processing.

Whether one narrowly confines the art to which the Bunnell machine relates to the making of cotton tipped applicators or whether one extends the art to which it relates to all handling of cotton, it is appropriate to consider these devices in determining whether the Bunnell machine exhibits novelty. In Miller v. Life Savers, 2 Cir., 1933, 62 F.2d 513, the court held that consideration of the bending of soft metal rods was appropriate in ruling upon the scope of protection to be allowed a patent relating to the bending of rods of candy. The court stated:

"Miller's machine follows essentially the teachings of United States patent No. 819,543 to Hart. To be sure the Hart patent related to a shaping by bending or curling of a rod of metal soft enough to be bent without changing its cross section, but the operation in the case of a plastic rod of candy and a rod of soft metal is similar. * * * The validity of the Miller patent was assumed by the court below, and has hardly been questioned. We do not say that it involved no invention over Hart, but only that the latter patent so narrowed the field of invention that Miller is not entitled to claim that he originated the process of curling a plastic substance of predetermined length and diameter about a post and of then compressing it to eliminate irregularities of form. * * * It is well established that, if a device in another art can be fitted by ordinary mechanical skill to perform the function of a patent under judicial consideration, it is a pertinent reference to

determine the scope of the claims. * * *" 62 F.2d at page 515.

Intermittent and continuous rollers were used to break off wads of cotton when Bunnell's machine was patented. It would not require more than ordinary mechanical skill to adapt such rollers to a machine similar to Gerstenzang's. Bunnell's claims cannot extend as far as plaintiff contends without being invalid on the grounds of having been anticipated in the prior or analogous art and thus being void for lack of novelty.

I do not believe, however, that Bunnell's claims include a wad forming mechanism utilizing continuous and intermittent rollers. Claims 9, 10 and 21 refer to a mechanism for grasping a strand of cotton and a mechanism for grasping and pulling said strand away from the first mechanism and thereby pulling off a wad. From an inspection of the specification it can be seen that the mechanisms for grasping a strand of cotton at spaced points is the forward pair of jaws numbered 29 and 30 in the drawings. The mechanism for pulling the strand away from the first mechanism is in the rear pair of jaws numbered 29A and 30A in the drawings.

Plaintiff's contention that the claims should include rollers or gears as well as these reciprocating jaws is based upon the language starting on page 5, line 21, of the specification, which reads, "It is evident that various modifications of the present improvements may be made by those skilled in the art without departing from the scope and purview of the invention. For example, gears provided with suitable cooperating surfaces may be substituted for the jaws 29 and 30 without departing from the scope of the appended claims." Jaws 29 and 30 are the forward pairs of jaws only, and it would be reading too much into the specification to hold that this suggestion that gears could be substituted for them, also carries the idea that other gears could be substituted for jaws 29A and 30A and that one set of these gears would operate intermittently and one continuously to form wads. Bunnell's reference to the substitution of gears for jaws 29 and 30 alone, is

conceivable, but action is produced by them different from rollers or gears and there is neither suggestion or auto suggestion of the kind of devices and their action that would be substituted for the operations that would follow that of jaws 29 and 30 and we are left in the dark as to substitutes for the employment of Bunnell's grasping and transfer mechanisms.

With this aspect of claims 9, 10 and 21 limited to a wad forming mechanism consisting of moving jaws, the Bunnell machine was not anticipated by the Johnson & Johnson sanitary napkin machine, by the Sewall patent 1,434,917, and by the Fortier patent 1,755,109 whose wad forming functions was performed by rollers.

Having found that plaintiff's claims are not so broad as to have been anticipated by devices using rollers to break off cotton wads, it is unnecessary to consider defendant's contention that plaintiff's patent is void because plaintiff failed to disclaim machines using rollers.

The defendant cited other machine patents as being a part of the prior art—Richmond 525,798 dated September 11, 1894, Trundle 1,438,623 of December 12, 1922, De Felice 1,481,314 of January 22, 1924, and De Felice 1,700,584 of January 29, 1929. They need not be described in detail here, for their operation does not approach that of the Bunnell machine as closely as the machines just described, and consequently would not affect Bunnell's claim to a greater extent than those.

## IV

Related to the question of the scope of the Bunnell claims and the effect thereon of the prior art is the question whether the accused machine infringes the Bunnell patent. It has been held that the Bunnell claim must be limited to a wad forming, transferring and shaping mechanism whose functions are performed by pairs of moving jaws and by mechanical arms with steel fingers at their ends. Only if the accused machine performs substantially the same function in substantially the same way to obtain the same result can it be held to infringe the Bunnell patent, Graver Tank Mfg. Co. v. Linde Air Prod-

ucts Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097.

Plaintiff cites the case of Q-Tips, Inc., v. Glickston, D.C.1939, 27 F.Supp. 948 as controlling on the issue of infringement. In that case the defendant used a machine employing a stick carrier device which operated intermittently, a pair of intermittent rollers or gears which, in conjunction with a pair of continuously rotating gears, tore off wads of cotton prior to the swab forming operation. Q-Tips, Inc., sued defendant for infringement of both the Gerstenzang and Bunnell patents. The court held that neither of these patents was anticipated in the prior art and that both were infringed by defendants.

Two factors detract from the applicability of this opinion to the present case. In the first place, the Gerstenzang patent had not expired, and, assuming its validity, it was not available for the use of that defendant as it is for this defendant. Secondly, it does not appear that the court in that case was referred to the Johnson & Johnson sanitary napkin machine, the Sewall machine and the Fortier machine.

I am persuaded by examination of the machines in question here and of the patents and by testimony given at the trial that the wad forming, transferring and shaping device of the Bunnell patent, the only part which is patentable, is not infringed by the system of rollers of the defendant's machine, for the rollers perform in a substantially different manner.

The reciprocating action of the mechanical jaws of the Bunnell patent to tear off cotton wads has already been described. Use of intermittent and continuous rollers to perform this function is a difference of substance. Whereas the Bunnell device employed a fairly complex system of springs, cams and levers to activate the combination of reciprocating arms, mechanical fingers and wad inserter device the function of which was to transfer the wads of cotton to the stick ends and shape them thereon, the accused machine uses a much more simple mechanism to achieve that end. As has been indicated, the broken off wad is ejected from the transfer rollers onto the cotton supports, where the stick

ends themselves pick up the wads, carrying them to the stick rotating and cotton forming rollers. Without deciding whether the accused machine exhibits invention over the prior art, it must be held that it does not infringe the Bunnell patent.

. The Trade-mark Case (C 284–49)

Originally, when cotton tipped applicators were made by Mrs. Forbis, they were sold under the name of Baby Nose-Gays.[34] In 1925, after The Leo Gerstenzang Co., Inc. purchased an assignment of the product patent from Mrs. Forbis, the packages of applicators were labelled Baby-Gays.[35] In 1926 the legend was changed to read "Q-Tips Baby Gays",[36] and in 1927 application was made to register the mark "Q-Tips Baby Gays".[37] Sometime after 1926 the words "Baby Gays" were dropped and the concern began to develop "Q-Tips" as its identifying mark, applying for registration of it on September 14, 1933.[38] Packages were made up using blue paper with pictures of double tipped applicators upon them,[39] features which have been the basis for plaintiff's packaged sign since that time. The design of the crossed applicators was made by dropping them and then photographing the resulting pattern.[40] The "Q" in Q-Tips was used so that the name in its entirety would sound like "cute tips"[41] when spoken. It would appear that when the mark "Q-Tips" was originated, the product to which it applied was known as a medical swab or a swab,[42] but that thereafter the term "applicator" or "cotton-tipped applicator" gained currency.[43]

There has been some use by others of the word "tips" in their trade name for the product. Samuel and Irving Glickston manufactured double tipped applicators, calling them "Twin-Tips". In 1939 the United States District Court, Eastern District of New York, issued an injunction which, among others, restrained the Glickstons from using the name "Twin-Tips", Q-Tips, Inc., v. Glickston, supra. The Glickstons then sold the product under the name of "Twin-etts".[44] Realmont Limited of Canada has, since 1939, produced and sold an applicator with a cotton swab on one end only under the name of Little Baby Cherub Tips.[45] About 1947 Q-Tips Sales Corporation started selling single tipped applicators to Realmont,[46] but after it started the trade-mark suit it made rather weak objections to Realmont's name for the product,[47] which objections were without effect.[48]

In 1947 The Mennen Company released for distribution to the trade a product designated "Mennen Tips-for-Tots".[49] After some delay in spite of several opportunities to protest against this use of "tips", plaintiff objected to it shortly before starting the trade-mark action. Mennen voluntarily abandoned the name.

Originally the defendant was the sole distributor of "Q-Tips" in the hospital field,[50] selling only single tipped applicators, which they bought from Q-Tips, Inc., in three inch and six inch sizes.[51] They called this product cotton tipped applicators.[52] About 1943 the defendant became dissatisfied with the arrangement and began to investigate alternative methods of procuring and marketing the product.[53] It decided to enter the retail trade by making and selling its own double tipped applicators. After considerable search for an appropriate

34. Exhibit DHH 36.
35. Exhibit DHH–D II.
36. Transcript, p. 8; Ex. DHH–DII.
37. Exhibit P 7.
38. Exhibit P 8.
39. Transcript, pp. 20, 21.
40. Transcript, p. 21.
41. Transcript, p. 95.
42. E.g., U.S.Pat.No. 1,721,815.
43. E.g., U.S.Pat.No.2,576,068.

44. Transcript, p. 38.
45. Exhibit DHH–DII.
46. Exhibit DHH–DII.
47. Exhibit DHH–DII.
48. Exhibit DHH–DII.
49. Exhibit DHH–DII.
50. Transcript, p. 353.
51. Transcript, p. 318.
52. Transcript, p. 318.
53. Transcript, pp. 352–354.

name for the double tipped items it was decided to call them "Johnson's Cotton Tipped Applicators." [54]

Johnson's Cotton Tipped Applicators were introduced to the trade in 1947,[55] packaged in a flat, light blue box which had a cover which could be lifted off completely. On the top of the box there were pictured six applicators lined up adjacent to each other in a vertical position; there was the legend which named the product, "Johnson's Cotton Tipped Applicators", which noted that the product was sterile and that the box contained a certain number of double tipped swabs. In addition there was a picture of four happy children romping in play.[56] The defendant continued selling its single tipped applicators in the hospital field under the name "Cotton Tipped Applicators".

Almost immediately the defendant became dissatisfied with this "put-up". The cost of the package was excessive; it didn't display well on store shelves; its cover arrangement caused spilling of the contents when the box was kicked off a bathinette by a baby, or otherwise disturbed.[57] To remedy this situation, defendant adopted the packaging which plaintiff claims infringes its trade-mark and constitutes unfair competition. Applicators were packaged in a dress similar to that of the defendant's baby items, which use boxes with a white (or occasionally another light color) background with an orange basket weave border along the top and bottom edges. The word "Johnson's" appeared in script and in larger block letters was written "Cotton Tips". Beneath the new name of the product was a picture of crossed applicators.[58] The boxes came in two sizes—54 applicators and 240 applicators, the same quantities as were packaged by the plaintiff. The applicators themselves were of the same dimensions and the boxes were about the same sizes as the plaintiff's.[59]

The defendant had searched for an appropriate name to replace "Cotton Tipped Applicators", before coming up with "Cotton Tips". When it decided upon that name for its double tipped applicators, it also decided to change the name of the hospital product, the single tipped applicators, from "cotton tipped applicators" to "Cotton Tips".[60] Apparently this caused confusion in the hospital market and the name for the single tipped item was changed back to "cotton tipped applicators".[61] A determined effort was made by the defendant to differentiate the terms "cotton tipped applicators" and "cotton tips" in its theory that the single tipped applicator should be known as a "cotton tipped applicator" for it was merely in hospital use for applying substances. It further theorized that the double tipped applicator was used for cleansing and sanitary purposes and therefore the defendant held that the term cotton tipped applicator was inappropriate and that these should be called "Cotton Tips". As to the double tipped product, it appears that the defendant attempted to use the "Cotton Tips" name consistently by eliminating from its publications and the speech of its agents and employees the names—swab and applicator. The defendant devoted a considerable amount of money to advertising the revamped packaging of the double tipped product and to publicize the name "Cotton Tips", its advertising budget being 98% of the total gross dollar receipts from the product in 1949, 81% in 1950 and 54% in 1951.[62]

## Discussion

### I

A contention of defendant's which, if accepted would be dispositive of this aspect of the case, is that the term "Q-Tips" is not a valid trade-mark and therefore cannot be infringed by "Cotton Tips". The reasons for this contention are that the word "tips" is descriptive and that the en-

54. Transcript, p. 300.

55. Transcript, p. 301.

56. Exhibit, P. 32.

57. Transcript, pp. 301, 302.

58. Exhibit P 45.

59. Exhibit DY; Exhibit P 71.

60. Transcript, pp. 323, 324.

61. Transcript, pp. 369–372.

62. Transcript, p. 406.

tire term "Q-Tips" has become the generic name for cotton tipped applicators with swabs on each end.

A trade-mark is an arbitrary or fanciful symbol, consisting either of words or pictures, which is designed to indicate the origin of a product. A device which is merely descriptive of an article of trade cannot be afforded legal protection as a trade-mark. Warner & Co. v. Eli Lilly & Co., 1924, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161.

The defendant has introduced much evidence which it claims establishes that "tips" is descriptive. This evidence shows that plaintiff uses "tips" on its packages in phrases such as "100 Tips" and in its advertising blurbs such as "A tip for each ear." It shows that when plaintiff contemplated selling other products, it devised such names as "Q-Talc" and "Q-Soap", not "Q-Tip Talc" or "Q-Tip Soap", and that when it had products with cotton swabs at one end of the stick only, it used "tips" in such names as "Sani-Tips". The defendant's evidence also establishes that persons other than plaintiff have used the word "tips" in such a manner as, " * * * for economy, we recommend the 25¢ size—136 tips, or 50¢ size—272 tips."

Whether a word is descriptive or has arbitrary significance must be decided, not in the abstract, but in relation to the goods in question and the context in which it is used. See Judson Dunaway Corporation v. Hygienic Products Co., 1 Cir., 1949, 178 F.2d 461, 465, certiorari denied, 1950, 339 U.S. 948, 70 S.Ct. 802, 94 L.Ed. 1362. Restatement of the Law of Torts § 721, Comment a. The most appropriate definition of "tips" for the purpose of this controversy appears in Websters New International Dictionary of the English Language (1947) and reads, "The pointed or rounded end or extremity of anything." In the drug trade, where cotton tipped applicators are sold, the word "tips" without more, conveys little meaning. Until the plaintiff popularized its product, the addition of "Q" to "tips" could hardly have rendered "tips" more meaningful to the trade.

In determining whether a mark is descriptive, the court examines it as a whole, W. G. Reardon Laboratories v. B. & B. Exterminators, 4 Cir., 1934, 71 F.2d 515. In the light of such an examination I am constrained to hold that the entire term "Q-Tips" is an arbitrary symbol which has acquired the meaning of a cotton tipped applicator made by plaintiff.

Undeniably the word "tips" has also been used by plaintiff and others descriptively to refer to the rounded, cotton covered ends of applicators. This is the use of the word in most, if not all, of the exhibits gathered by defendant. In this context "tip" is not used to refer to the product as a whole. For example, in such a sentence as, "When cleaning baby ears, moisten the tip with vaseline," "tip" must refer to the cotton end, not to the whole product.

Defendant also contends that even if "Q-Tips" were a valid trade-mark at one time, it has since lost that status because it has become the generic name for the product, cotton tipped applicators. Defendant points out that plaintiff had a product patent which has expired and that prior to defendant's entry into the applicator field, plaintiff sold over 90% of the double tipped variety. In addition, it points out that "Q-Tips" has been used by plaintiff and others in a generic sense. For example, one of plaintiff's advertisements read, "Then he put a Q-Tip beside one of my shaggy, skinny swabs. Next, he took a Q-Tip and jabbed it against my finger." Certain layette lists of baby requirements prepared by stores for distribution to the public included the item "Q-Tips" along with admittedly generic product names.

The law on the question is stated in Singer Mfg. Co. v. June Mfg. Co., 1896, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118.

"The result, then, of the American, the English, and the French doctrine universally upheld is this: That where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become, by his consent, either express or tacit, the identifying and generic name of the thing patented, this name

passes to the public with the cessation of the monopoly which the patent created. Where another avails himself of this public dedication to make the machine and use the generic designation, he can do so in all forms, with the fullest liberty, by affixing such name to the machines, by referring to it in advertisements, and by other means, subject, however, to the condition that the name must be so used as not to deprive others of their rights, or to deceive the public; and, therefore, that the name must be accompanied with such indications that the thing manufactured is the work of the one making it, as will unmistakably inform the public of that fact." 163 U.S. at pages 199, 200, 16 S.Ct. at page 1014.

It must now be determined whether the patentee's name "Q-Tips" has become by its consent the identifying and generic name of cotton tipped applicators. The test for deciding whether an arbitrary name has become the generic title of a product is "What do the buyers understand by the word for whose use the parties are contending? If they understand by it only the kind of goods sold, then * * * it makes no difference whatever what efforts the plaintiff has made to get them to understand more." Bayer Co. v. United Drug Co., D.C.S.D.N.Y.1921, 272 F. 505, at page 509. That case pointed out that to consumers the term "aspirin" meant only a product, not a manufacturer, and therefore "aspirin" could not be appropriated as a trade-mark.

The situation as regards "Q-Tips" is quite different from that in the Bayer case and that in Dupont Cellophane Co. v. Waxed Products Co., 2 Cir., 1936, 85 F.2d 75, certiorari denied E. I. Du Pont De Nemours & Co. v. Waxed Products Co., 1936, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443, which applies the same principle. Here, though plaintiff held a product patent and though he occupied a prominent role in the double tipped applicator field, the evidence indicates that the term "Q-Tips" has not come to mean to the consumer the product double tipped applicator as distin-

guished from a certain brand of applicator. There were competitors of plaintiff, each of which employed a trade-mark of its own combined with a descriptive term such as applicator, swab or cotton tipped applicator. The evidence indicates that druggists treated "Q-Tips" as a brand name, not as a name for a product. Instances of use of the word "Q-Tips" in a generic sense, while evidentiary, do not of themselves necessarily establish that the buyers' understanding is that it is the name of a kind of goods sold. Use by the plaintiff itself of the name "Q-Tips" without including thereafter a generic name for the product is the type of practice which caused "aspirin" and "cellophane" to become generic names rather than arbitrary ones indicating the source of the goods, for public acceptance of the words was so complete that there were no other words by which the products could be identified. In the present case, however, "Q-Tips" has not yet acquired such a hold on the minds of consumers of cotton tipped applicators.

I am led to the conclusion that plaintiff's trade-mark "Q-Tips" has not become invalidated either by reason of descriptiveness or because it has become a generic term.

II

Having held that "Q-Tips" is a valid trade-mark, it is necessary to determine if it is infringed by defendant's use of "Cotton Tips". The question turns upon whether defendant is using "tips" descriptively. The Supreme Court has stated:

"A name which is merely descriptive of the ingredients, qualities or characteristics of an article of trade cannot be appropriated as a trade-mark and the exclusive use of it afforded legal protection. The use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin or ownership of the product." Warner Co. v. Eli Lilly & Co., supra, 265 U.S. at page 528, 44 S.Ct. at page 616.

Defendant has offered voluminous evidence which clearly demonstrates that "cotton tips" has been used descriptively by plaintiff and others. But that does not settle the question whether when defendant employes the term "Cotton Tips" in large block letters on its packages of applicators it is descriptive or whether it is used in the manner of a trade-mark. The evidence indicates that defendant was well aware that its use of "Cotton Tips" as a product name might not go unchallenged by plaintiff and that defendant prepared to meet that challenge.

For many years plaintiff manufactured cotton tipped applicators for defendant to sell to the hospital trade. The defendant was familiar with plaintiff's position in the market as the chief supplier of this product. There can be no doubt from the evidence that defendant was determined that if it could not buy plaintiff out it intended to assert itself as a competitor of plaintiff in the cotton tipped applicator field. To this end it was in search of a name which would be the maximum aid in achieving the most successful competition. It tried "cotton tipped applicators" as heretofore mentioned but found the term wanting. Its advertising agent in this quest solicited suggestions for a name by conducting contests among its employees. Finally the defendant fixed upon the word "tips" with not only full knowledge of its use by the plaintiff but also in the light of the close relationship between the parties, with the anticipation that the plaintiff would resist the use of the word "tips" as the name or part of a name for any item competing with its product. From the outset of its decision to use the word "tips" as a part of its name for its applicators defendant trained its employees and endeavored to drill all others in the view that the double tipped applicators had always been known as "Cotton Tips", in the style of its mark. The evidence discloses that every department of the defendant, from its legal office to its production and sales ends, taught or were taught the use of this synthesis. Its campaign included large-scale advertising in addition to the thorough indoctrination of its own personnel in the new terminology.

It is interesting to note that in its application for a patent on its double tipped applicator machine, the defendant itself called it a "machine for making cotton tipped applicators", whereas after its decision to change the product name it religiously refrained from using the discarded title. The results of defendant's effort, however, has created only a synthetic name for this product and an arbitrary distinction between the nomenclature of the single and the double tipped items. Neither the name nor the distinction were familiar to the buying public. The only reason that can be given for this creation of a name and for the arbitrary classification of the product is that the defendant desired to utilize a term as similar to "Q-Tips" as it considered to be legally possible. It is my opinion that the defendant has gone too far.

There is no question that "cotton" alone is descriptive and that "tips" can be used in such a way that it refers to the ends of the sticks. But from this observation it does not necessarily follow that the entire term "Cotton Tips" as used by defendant on his packages is merely descriptive. W. G. Reardon Laboratories v. B & B Exterminators, supra, concerned a plaintiff which sued to enjoin a defendant from infringing its trade-marks "Mouse Seed" and "Rat Seed", names for rodent poison. In rejecting the defendant's contention that these terms were descriptive, the court stated:

"* * * In considering this question it is plainly to be seen that the words used separately are descriptive. When one uses the word mouse there is no doubt as to what the word describes and there is nothing unique about it; its use brings at once to the mind the picture of a small rodent, a well known animal. Likewise the use of the word seed at once conveys to the mind something from which plants may be germinated, such as seed wheat or tobacco seed, or something to be used as food, such as bird seed. In the

ordinary acceptance of the word 'seed' it would never convey to the mind by its use alone anything poisonous. But when the two words are coupled together to make 'Mouse Seed' there is no immediate meaning conveyed but a suggestion to the mind as to what the term could mean and the two words used in conjunction cease to be descriptive and become suggestive. Mature thought would probably lead to but one conclusion—that a mouse poison was indicated—but it requires thought to reach this conclusion. The words used together possess an element of incongruity which make them unusual and unique and therefore, in our opinion, a valid trade-mark. * * *" 71 F. 2d at page 517.

■ The reasoning of the Reardon Laboratories case is persuasive here. "Cotton Tips" is not the name by which this product has been known. The term "Cotton Tips", as used by the defendant on its packages is not *merely* descriptive of the cotton tipped applicators. Because of years of advertising and selling of the "Q-Tips" brand, the word "tips" may be suggestive of the character of the goods sold by the defendant, but that will not negative a trade-mark use. See Telechron, Inc., v. Telicon Corp., 3 Cir., 1952, 198 F.2d 903, 906; Globe-Werniche Co. v. Brown, C.C. W.D.Pa.1903, 121 F. 185, 187.

As defendant's use of "Cotton Tips" on its box covers is not descriptive of its product, it cannot avail itself of the defense embodied in 15 U.S.C.A. § 1115(b).[63]

■ I conclude that defendant has unfairly appropriated the word "tips", a prominent part of plaintiff's trade-mark, and that the term "Cotton Tips", as used

by the defendant, is so similar to plaintiff's mark that it will confuse the buying public. In this respect I follow the decision of the United States District Court, Eastern District of New York, in the case of Q-Tips, Inc., v. Glickston, supra, which held that the mark "Twin-Tips" infringed "Q-Tips".

### III

■ Plaintiff's next cause of action in the trade-mark case is based upon unfair competition. Unfair competition, which includes trade-mark infringement, differs from it in that it does not involve the violation of an exclusive right to use a word, mark or symbol, but rather involves any violation of a right arising from the operation of an established business, House of Westmore v. Denney, 3 Cir., 1945, 151 F.2d 261. Here plaintiff asserts that not only has defendant adopted a name for its product which infringes upon plaintiff's trade-mark, but also that defendant has adopted a dress for its packages that is so close to plaintiff's that the public will confuse the source of the product.

The factors which plaintiff cite as making for confusion are the identical dimensions of plaintiff's and defendant's applicators, the fact that defendant uses boxes which are almost exactly the same size as plaintiff's boxes and which contain the same number of applicators, use of the word "Tips" in its name for the product, and a picture of crossed applicators on the box.

■ The principle to be applied in this case has been well stated in Wirtz v. Eagle Bottling Co., 1892, 50 N.J.Eq. 164, 24 A. 658:

"* * * The leading principle of the law on this subject is that no man should be permitted to sell his goods

---

63. "(b) If the right to use the registered mark has become incontestable under section 1065 of this title, the certificate shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate subject to any conditions or limitations stated therein except when one of the following defenses or defects is established:
* * * * *

"(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin;"

on the reputation which another dealer has established in the market for his goods, and this principle applies with equal force to the case where the goods of such other dealer are known in the market by a label, as it does to the case where they are known by a mark which is strictly a trade-mark. No dealer can lawfully adopt the label of another dealer, or one so near like it as to lead the public to suppose that the article to which it is affixed was put upon the market by such other dealer. * * *" 50 N.J.Eq. at page 166, 24 A. at page 658.

In the case at hand there is insufficient evidence to establish that the public has been confused by defendant's packaging; the issue must be resolved, therefore, by a comparison of the rival "put ups".

The fact that defendant's applicators are of the same size as plaintiff's cannot of itself establish unfair competition. The Forbis patent had expired, and anyone was free to make applicators in any size he desired. Neither do I consider the pictures of the applicators on defendant's package to be unfair or misleading. It is well established that a seller may place a picture of his product on a package provided that the picture is not so similar to that used on a rival's package as to cause confusion. Judson Dunaway Corp. v. Hygienic Products Co., supra. Plaintiff pictures four applicators in a more or less upright position. Two lie across a third and the fourth does not touch the others. Defendant, on the other hand, portrays only two applicators. They are crossed, but lie in roughly a horizontal position. This representation is not confusingly similar to plaintiff's.

The dimensions of the package are factors to be considered when determining if defendant's packaging is confusingly similar to plaintiff's. Here, however, the other differences are so great that the similarity of shape is not objectionable. Defendant's package indicates its source by the word "Johnson's" clearly printed on it. The defendant's package has a white background, a border of orange basket weave along the top and bottom edges and lettering in blue except for the word "sterile", which is in red. The general appearance is in conformity with the established packaging of defendant's baby products. The Q-Tips box has a light blue background, a dark blue streamer-like effect upon which some words appear in white letters and some in light blue letters, and some dark blue printing at the bottom of the box. No reasonably observant person is likely to be misled either by any single element of defendant's package, or by all the elements viewed together, with the exception of the word "Tips".

## IV

In its amended and supplemental complaint the plaintiff advanced a third cause of action grounded on the theory of "dilution" of the value and distinctiveness of its mark "Q-Tips" through the defendant's deliberate and malicious use of the word "Tips" in its mark "Cotton Tips" in connection with its product as used in catalogs, price lists and other publications.

The "dilution" theory has been applied where the products of the parties have been dissimilar or their territories are different as in the case of Alfred Dunhill of London, Inc., v. Dunhill Shirt Shop, Inc., D.C.S.D.N.Y.1929, 3 F.Supp. 487, where the use of "Dunhill" on shirts was ordered to be enjoined by the manufacturer of pipes and the case of Stork Restaurant, Inc., v. Sahati, 9 Cir., 1948, 166 F.2d 348, where the use of the trade name "Stork Club" on a saloon in California was enjoined by the owners of a night club with the same mark in non-competing territory in New York City.

Protection is afforded to the owner of a trade-mark against the use by others of imitations of his mark on a product similar enough to cause confusion in the minds of the customers as to the source of the goods through the ordinary redress for infringement without resort to the doctrine of "dilution". See Pro-phy-lac-tic Brush Co. v. Jordan Marsh Co., 1 Cir., 1948, 165 F.2d 549. In the instant case the products are the same and the doctrine of "dilution", as projected by the plaintiff,

appears to have no application. The plaintiff goes a step further, however, and asserts that it is entitled to relief under this doctrine by reason of a statute of the State of Massachusetts as follows:

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a trade name or trademark shall be a ground for injunctive relief in cases of trade-mark infringement or unfair competition notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services." Massachusetts General Laws (Ter.Ed.) c. 110, § 7A, approved May 2, 1947, St.1947, c. 307.

 It has been suggested that the purpose of the statute was to permit injunctive relief in state courts in cases of trade-mark infringement or unfair competition notwithstanding the absence of competition between the parties or of confusion as to the source of the goods or services. Sterling Brewing, Inc., v. Gold Spring Brewing Corp., D.C.Mass.1951, 100 F.Supp. 412. As interpreted, it would not appear that the statute has enlarged the substantive rights of a trade-mark owner in that state. Sterling Brewing, Inc., v. Cold Spring Brewing Corp., supra; Mann v. Parkway Motor Sales, Inc., 1949, 324 Mass. 151, 85 N.E.2d 210 (Sup.Jud.Ct.Mass.). In any event, having found that defendant has infringed plaintiff's trade-mark "Q-Tips", plaintiff is entitled to injunctive relief restraining defendant from the use of the word "tips" in any trade-mark designating its cotton tipped applicators. I do not see that this local statute can in any way improve plaintiff's position even in Massachusetts.

 The evidence before us in regards to the costs of marketing the defendant's

product under the trade-mark "Cotton Tips" and the testimony of the plaintiff showing that there has been no decisive decline in its business [64] disposes me to believe that an excursion into profits and damages would be fruitless, and I am constrained therefore to hold that justice will be satisfied by an injunction restraining the defendant from use of the word "tips", without awarding an accounting for profits and damages.

"* * * Under the Trade Mark Act of 1905, as under its predecessors, an accounting has been denied where an injunction will satisfy the equities of the case. (Cases cited.) The same is true in case of unfair competition. Straus v. Notaseme [Hosiery] Co., 240 U.S. 179, 181–183, 36 S.Ct. 288, 289, 60 L.Ed. 590. Here, as we have noted, there has been no showing of fraud or palming off. * * * Moreover, as stated by the Circuit Court of Appeals, the likelihood of damage to petitioner or profit to respondents due to any misrepresentation seems slight. In view of these various circumstances it seems to us that the injunction will satisfy the equities of the case." [65] Champion Spark Plug Co. v. Sanders, 331 U.S. 125, at pages 131, 132, 67 S.Ct. 1136, at page 1139, 91 L. Ed. 1386.

Affirmative Defense and Counterclaim.

I

The final matter which must be disposed of is the question of defendant's affirmative defense of unclean hands and its counterclaim. It is conceded that prior to the defendant's entry into the cotton tipped applicator field, Q-Tips, Inc., sold at least 90% of the double tipped product distributed in the United States. Defendant contends

---

64. Transcript, pp. 155, 156.

65. Under the Trade Mark Act of July, 1946, 15 U.S.C.A. § 1051 et seq., application of equitable considerations along this line is contemplated. The statute reads: "When a violation of any right of the registrant of a mark registered in the Patent Office shall have been established in any civil action arising un-

der this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1113(1) (b)[1] of this title, *and subject to the principles of equity*, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. * * *" (Italics supplied.)

"[1]. So in original. Probably should read '1114(1) (b)'." 15 U.S.C.A. § 1117.

that plaintiff engaged in various unlawful and unfair activities designed to create and foster a monopoly in the double tipped applicator field. It was alleged that plaintiff's course of conduct included, 1st, an attempt to force the trade that purchased applicators to buy only from plaintiff by advertising that defendant was a patent infringer; 2nd, false representations that plaintiff's product was patented; 3rd, cutting off defendant from supplies of wooden and paper sticks; 4th, granting licenses under its machine patents which limited the number of unpatented double tipped applicators that might be produced or restricted the use of such machines to the production of single tipped applicators; and 5th, bringing the patent suit with knowledge of the construction of the accused machine and therefore with knowledge that it had neither the structure nor the mode of operation of the Bunnell machine and bringing it in view of an offer made to defendant prior to its commencement of a license at nominal fee under the Bunnell patent if defendant would stay out of the retail field and in view of an offer to defendant made subsequent to the bringing of suit of a license under the Bunnell patent to make only restricted quantities of the double tipped product.

## II

Plaintiff's advertisement in a publication of the drug trade stated:

"We have received numerous inquiries as to the suit which we have brought against the firm of Johnson & Johnson of New Brunswick, New Jersey. This suit is for infringement of the machine used by us in the manufacture of Q-Tips. This patent has already been upheld against another infringer by the United States District Court in Brooklyn."

Defendant emphasizes that though this advertisement is literally true, it appeared in a publication read largely by consumers of applicators, which were not patented, and would be construed by them to mean that defendant was accused of violating a product patent.

Defendant relies upon four cases to establish its contentions. Circle S. Products Co. v. Powell Products, 7 Cir., 1949, 174 F.2d 562; Maytag Co. v. Meadows Mfg. Co., 7 Cir., 1930, 45 F.2d 299, certiorari denied, 1930, 281 U.S. 737, 50 S.Ct. 250, 74 L.Ed. 1151; Panay Horizontal Show Jar Co. v. Aridor Co., 7 Cir., 1923, 292 F. 858 and Dehydro, Inc., v. Tretolite Co., D.C.N.D.Okl.1931, 53 F.2d 273. In these cases not only were the patentees' statements false, but also their circulation was widespread. In the present case plaintiff's statements were true and, if read carefully, not misleading. I am not prepared to say that these advertisements were not a legitimate response to questions concerning plaintiff's suit. If plaintiff had had a cause of action for patent infringement, this behavior would not have been so unconscionable as to have required that it be barred from bringing its suit. See A. Hollander & Son, Inc., v. Imperial Fur Blending Corp., 1949, 2 N.J. 235, 245, 66 A.2d 319.

## III

Defendant contends that plaintiff falsely indicated that it had a product patent and that this is a ground to deny it relief. Originally plaintiff's product was covered by the Forbis patent, granted in 1927, expiring in 1944, the claim of which is, "As an article of manufacture, a flexible stem of substantially the same thickness throughout and having its ends provided with an antiseptic, and wisps of cotton treated with an antiseptic wrapped about the ends of the stem and firmly attached thereto." Prior to utilization of the Gerstenzang machine it was the practice of the girls who fashioned the cotton swabs of the applicators to dip the ends of the sticks in a boric acid solution and to saturate the swabs in the same solution.[66] After machine operations were begun, the ends of the sticks were no longer dipped in the solution, but the solution was applied to the swabs in such a quantity that it might well have penetrated to the stick ends.[67] In about 1939 cessation of the use of "boric acid" in plaintiff's literature was ordered by the

66. Transcript, p. 55.

67. Transcript, p. 1284.

Food and Drug Administrator as the quantities applied to the swabs was not sufficient to permit such advertising.[68] The use of boric acid itself was continued until 1945.[69]

On its trade-marked package covers, dating roughly from 1927 until 1943, plaintiff employed the word "patent" or "patented".[70] From about 1940 until about 1947 there were written on plaintiff's package inserts the words "Patented U.S.Pat. Off." [71] Plaintiff contends that until 1944 it was entitled to claim patent protection for its product under the Forbis patent, and that the application of boric acid which penetrated to the stick satisfied the Forbis claim calling for application of an antiseptic to the cotton and to the stick ends.

It is true that the Food and Drug Administration apparently decided that the amount of boric acid used by plaintiff was not sufficient to warrant the representations made by it in its literature. But plaintiff continued to use some boric acid until after the life of the patent and this would seem to have met the claim that the ends of the applicators were "provided with an antiseptic", at least to the extent that the weakness of the solution should not at this date be regarded as defeating the patent.

As to the patent markings after 1944, plaintiff admits that they were erroneous, but asserts that their use was inadvertent and was stopped as soon as defendant's answer in the patent suit brought the error to its attention. The testimony indicates that Mr. Charles J. Gerard became associated with Q-Tips, Inc., in 1942 and took charge of the business when Mr. Gerstenzang engaged in government service overseas during the war.[72] He testified that he was unfamiliar with the patent situation and as a result was unaware that the patent markings on the circulars should have been removed in 1944.[73] After defendant's answer in the patent case, and before commencement of the trade-mark action, plaintiff, upon advice of counsel, ceased using the markings.

The question is whether this conduct bars plaintiff from suing. Defendant cites the case of Preservaline Mfg. Co. v. Heller Chemical Co., C.C.N.D.Ill.1902, 118 F. 103, which concerns a plaintiff suing to protect its trade-name. The plaintiff's product patent had expired but it published trade circulars which set out that it was patented. Denying relief, the court stated:

" * * * It is a well-established rule of law that one invoking the aid of a court of equity must himself be free from fraud and misrepresentation with regard to the matter in which he seeks relief. Therefore, if it appears that complainant in this case, at and preceding the time of the acts sought herein to be enjoined, was itself guilty of a fraud or fraudulent act calculated to impose upon the public in regard to the same transaction, then, no matter how impudent the act of defendant, a court of conscience will not lend itself to complainant's aid in securing to it the exclusive right to deceive the public." 118 F. at page 104.

In this regard, see also M. B. Fahey Tobacco Co. v. Senior, D.C.E.D.Pa.1917, 247 F. 809, 818–819, modified, 3 Cir., 1918, 252 F. 579.

The nature and context of the misrepresentations are important considerations when a court decides whether to withhold relief because a plaintiff has unclean hands; the defense is to be scrutinized with a critical eye. Coca-Cola v. Koke Co., 1920, 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189. Here the misrepresentation was apparently inadvertent, without intent to deceive. It would not appear that prospective rivals were deterred from entering the cotton tipped applicator field. As soon as plaintiff became aware of its error, it ceased making the misrepresentation. With these considerations in mind, I do not believe that plaintiff would have been barred in the machine patent suit on this ground had it had a cause of action, even though the misrepresentations were

68. Transcript, pp. 56, 57.

69. Transcript, p. 56.

70. Transcript, pp. 47–49.

71. Transcript, pp. 52, 53.

72. Transcript, pp. 1230, 1231.

73. Transcript, pp. 1231–1234.

being made at the commencement of that suit. This conclusion is suggested by Jacobs v. Beecham, 1911, 221 U.S. 263, 31 S. Ct. 555, 55 L.Ed. 729, which concerned a plaintiff suing to protect his trade name. He implied in his circulars that his product was made in England and that a Thomas Beecham owned the company, both representations being untrue. Sustaining circuit court affirmance of a decree for the plaintiff given by the trial court, Justice Holmes wrote:

"* * * Both of these matters are small survivals from a time when they were literally true, and are far too insignificant when taken with the total character of the plaintiff's advertising to leave him a defenseless prey to the world." 221 U.S. at page 273, 31 S. Ct. at page 557.

See also Ansehl v. Williams, 8 Cir., 1920, 267 F. 9, 14.

It must be held that plaintiff is not prevented from recovering judgment in the trade-mark suit by the doctrine of unclean hands, for plaintiff ceased using the objectionable circular prior to the commencement of that suit. That this is an important consideration is indicated by Justice Holmes' statement, "The plaintiff's position must be judged by the facts as they were when the suit was begun, not by the facts of a different condition and an earlier time." Coca-Cola v. Koke Co., supra, 254 U.S. at page 147, 41 S.Ct. at page 114. See also Restatement of the Law of Torts § 749, Comment a.

## IV

As a third ground for denying relief to plaintiff and as a basis for its counterclaim, defendant asserts that plaintiff engaged in a conspiracy to cut off defendant's stick supply. In the first part of 1947 defendant had been relying upon the B. F. D. Co. as a supplier of sticks.[74] A Mr. Hanafee was B. F. D. Co.'s sole distributor and as such he dealt with both plaintiff and defendant. In June, 1947, Mr. Hanafee informed the defendant that as B. F. D. Co.'s production schedule was filled and as there was a heavy demand for ice cream sticks, its stick order could not be filled.[75] Consequently the defendant was forced to obtain sticks elsewhere at a greater price and of inferior quality.[76]

Defendant rests heavily upon two facts to support its contention that Q-Tips conspired with B. F. D. Co. or with Mr. Hanafee to deprive it of sticks. In the first place, shipments of the 2⅞ inch sticks to plaintiff showed a marked increase at approximately the time defendant's order was cancelled. Shipments were about 14 millions of sticks in January, 1947, 42 millions in February, 30 or 31 millions in March, 6.5 millions in April, 33 millions in May, 22 millions in June, 30 millions in July, 81 millions in August, none in September, and 73 millions in October.[77] Total shipments in 1947 were approximately 40 percent greater than the total in 1946.[78] Secondly, defendant points out that plaintiff had an arrangement with an outfit named Setter Brothers whereby the latter made paper sticks for plaintiff and agreed not to sell such sticks to other makers of applicators.[79] For a comparatively short period of time beginning during the war plaintiff, in its attempt to alleviate the shortage of wooden sticks, experimented under an agreement with Setter Brothers to have the latter manufacture paper sticks. As part of the agreement whereby plaintiff and Setter Brothers undertook the experimentation in the production of the paper sticks it was provided that they would be manufactured exclusively for the plaintiff, but this provision was effective only a relatively short period of time until wooden sticks were again obtainable.[80] Indeed the experiment proved unsuccessful and the use of paper sticks was entirely discontinued in 1948 for the trade would not accept them for appli-

74. Transcript, pp. 427, 428.

75. Transcript, pp. 433, 434.

76. Transcript, pp. 438, 439.

77. Transcript, pp. 476–479.

78. Transcript, p. 480.

79. Transcript, p. 74.

80. Transcript, p. 104.

cator purposes.[81] Moreover the plaintiff at one time actually offered to sell paper sticks to the defendant.[82] In view of the fact that plaintiff's large stick orders were an attempt to overcome chronic stick shortages in the face of increasing sales,[83] and that Mr. Hanafee had been unable to supply plaintiff with all the sticks it needed prior to June, 1947,[83] there is not a sufficient basis to sustain the charge of a conspiracy by plaintiff to restrain trade in sticks with the defendant.

## V

Having failed to prove a combination of practices which, taken in their entirety, spells unlawful monopoly, defendant's objections to plaintiff's patent licensing agreements are answered in the opinion filed herein denying its motion for summary judgment. Nor do the plaintiff's offer of a license to defendant or its present suits against plaintiff add substance to the defendant's charges in this respect.

As the grounds for defendant's counterclaim are the same as those of its affirmative defense of unclean hands, the findings of fact and conclusions of law with respect to the defense necessarily preclude recovery on the counterclaim.

## Summary.

I hold that plaintiff cannot recover in the patent suit as defendant's machine does not infringe the Bunnell machine. Therefore defendant is entitled to judgment in its favor in that suit. In the trade-mark suit I hold that defendant's use of the word "Tips" in "Cotton Tips" as the name of its product infringes plaintiff's trade-mark "Q-Tips". Therefore plaintiff is entitled to an injunction restraining defendant from the use of the word "tips" as a trade-mark or part of a trade-mark for its cotton tipped applicators. Otherwise defendant's packaging of the said product does not constitute unfair competition. Plaintiff's cause of action for dilution is without merit. The defendant's charges of violation of the anti-trust laws and other unlawful activities upon the part of the plaintiff have failed both as defenses to the suits of the plaintiff and as counterclaims by the defendant, and plaintiff is entitled to judgment in its favor on the latter.

Since these cases were consolidated for trial and neither party has entirely prevailed, it would appear that each should bear its own costs.

The foregoing opinion shall constitute findings of fact and conclusions of law, as required by Rule 52, Fed.Rules Civ. Proc. 28 U.S.C.

An order for judgment in each case shall be settled in accordance with this opinion.

---

81. Transcript, p. 74.

82. Transcript, pp. 1283, 1284.

83. Transcript, p. 77, pp. 102–105.